# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| JOHN R. LOTT, JR.      : | |
|        Plaintiff,       : | Civil Action No. 06 C 2007 |
|        : | Judge Castillo |
|     v.        : | Magistrate Judge Levin |
| STEVEN D. LEVITT and    : | |
| HARPERCOLLINS PUBLISHERS, | |
| INC.        : | |
|      Defendants.     : | |

## PLAINTIFF JOHN R. LOTT, JR.'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Plaintiff, John R. Lott, Jr. ("Lott"), an economist, has sued Defendants Steven D.

Levitt's ("Levitt") and HarperCollins Publishers, Inc.'s ("HarperCollins") for defamation

as a result of a statement in a popular economics book – <u>Freakonomics: A Rogue</u>

<u>Economist Explores The Hidden Side Of Everything</u> – that falsely claims that other

scholars have been unable to replicate Lott's research results.  Lott has also sued Levitt

for sending a defamatory e-mail to another economist.

Defendants advance two fatally flawed arguments in their motions to dismiss the

complaint:[1]

---

[1] For simplicity, we are submitting one opposition to Defendants' motions.  Just as the combined length of
Defendants' two motions exceeds the 15-page limit prescribed by Local Rule 7.1, this opposition exceeds
the page limit.   We refer to HarperCollins' motion as "HarperCollins' Mot." and to Levitt's motion as
"Levitt's Mot."

Dockets.Justia.com

First, they argue that the statements are opinions that are constitutionally immunized under the First Amendment from a defamation action. This argument fails to apply the correct test for ascertaining whether an alleged defamatory statement is constitutionally protected. The Court is required to determine whether the statement is "objectively verifiable." The statements on which this action is based can readily be verified as either true or false. Defendants compound their analytical error by mischaracterizing this action as a scholarly debate over whether laws permitting citizens to carry concealed weapons reduce the rate of violent crime. It isn't. This is an action about Defendants' false accusations regarding Lott's research methodology.

Second, Defendants argue that their statements aren't defamatory *per se*[2] because extrinsic evidence is required to infuse a defamatory meaning and because, under the innocent construction rule, the statements can be reasonably interpreted as having a non-defamatory meaning. These arguments fail for the simple reason that the meaning of their words is crystal clear.

Once the Court frames the legal issue correctly and applies it to the words that are actually at issue -- there can be only one conclusion, namely, that the words are defamatory and not constitutionally protected.

## FACTUAL BACKGROUND

Lott writes in the field of law and economics and economics generally. He received his doctorate in economics from UCLA and has held positions at several prestigious universities, including Stanford University, Rice University, UCLA,

---

[2] A statement that is defamatory *per se* does not require proof of special damages.

University of Pennsylvania University of Chicago and Yale University. Most recently, he was a resident scholar at the American Enterprise Institute in Washington, D.C. Lott has established a reputation for exacting, credible, and reliable economic analysis, and has written books and articles on a variety of subjects, including gun control.[3] Lott's books and articles on gun control include <u>More Guns, Less Crime: Analyzing Crime and Gun Control Laws</u> (University of Chicago Press 1998, second edition 2000) and "Crime, Deterrence, and Right-to-Carry Concealed Handguns," co-authored with David Mustard, 26 <u>Journal of Legal Studies</u> 1 (January 1997).

Lott has conducted extensive research and statistical analysis on the statistical relationship between laws regulating the right to use, carry or own guns and the impact of such laws on serious crime in the United States. After careful study and statistical analysis, Lott has concluded that laws permitting individuals to carry concealed weapons result in a statistically significant and provable reduction in serious crime rates, including murder, rape, assault and robbery.

Lott's conclusions on this subject have generated a great deal of controversy. But every time an economist or other researcher has replicated Lott's research, he or she has confirmed Lott's conclusion. No scholar who has replicated Lott's statistical analysis has concluded that the data and methods on which he relied don't support his conclusion.

The first count of the complaint deals with a statement about Lott in a popular economics book written by Levitt (and co-authored by Stephen J. Dubner who is not a

---

[3] Lott has published extensively and is frequently cited. <u>See</u>, Tom Coupe, "Revealed Performances – Worldwide Ranking of Economists and Economics Departments -- 1969-2000," Table 8 (ranking Lott as 26th among economists in the world in terms of number of publications) and Table 9 (ranking Lott 86th in the world in terms of number of times his writings have been cited by others). Coupe's paper is available at: <u>http://student.ulb.ac.be/~tcoupe/updaterevealedperformances.pdf</u>.

defendant) and published by HarperCollins called <u>Freakonomics: A Rogue Economist</u> <u>Explores The Hidden Side of Everything</u> ("Freakonomics"). The authors devote approximately one page of their book to Lott and his research. At pages 133-34 they state as follows:

> Then there was the troubling allegation that Lott actually invented some of the survey data that supports his more-guns/less-crime theory. Regardless of whether the data were faked, Lott's admittedly intriguing hypothesis doesn't seem to be true. <u>When other scholars have tried to replicate his</u> <u>results, they found that right-to-carry laws simply don't bring down crime.</u>

(Emphasis added.)

The statement that when "other scholars have tried to replicate his results, they found that right-to-carry laws simply don't bring crime" is false because there are no published articles in which an economist or other researcher has attempted to replicate Lott's results and concluded that "right-to-carry laws simply don't bring down crime." The statement's clear meaning is that when "other scholars" tried to "replicate" Lott's results, they analyzed the identical data that Lott analyzed and analyzed it the way Lott did, but were unable to replicate Lott's result. In essence, the authors are alleging that Lott falsified his results. Their statement is defamatory *per se* because it attacks Lott's integrity and honesty in his profession as an economist, scholar and researcher, in the eyes of the academic community in which he works, and in the minds of the hundreds of thousands of academics, college students, graduate students, and members of the general public who read "Freakonomics."

The second count of the complaint deals with an e-mail that Levitt sent to an economist – John McCall ("McCall") – in Texas. Levitt's e-mail was in response to an e-mail from McCall in which McCall referred to special issue of <u>The Journal of Law &</u>

Economics (Vol. 44 (2) (pt.2)) published in October 2001 ("Special Issue"). The Special

Issue contains articles delivered at an academic conference co-sponsored by the Center

for Law, Economics, and Public Policy at Yale Law School and the American Enterprise

Institute. In his e-mail, McCall referred to the Special Issue and stated:

> I also found the following citations – have not read any of them yet, but it
> appears they all replicate Lott's research. The Journal of Law and
> Economics is not chopped liver.

Levitt responded as follows:

> It was not a peer refereed edition of the Journal. For $15,000 he was able
> to buy an issue and put in only work that supported him. My best friend
> was the editor and was outraged the press let Lott do this.

Levitt's e-mail was false and defamatory because the Special Issue was, in fact, peer

refereed, and because Lott didn't "buy" the issue, nor did he "put in only work that

supported him." Lott invited scholars who both agreed and disagreed with him to

provide articles. We allege that Levitt's e-mail is defamatory *per se* because it attacks

Lott's integrity and honesty in his profession as an economist, scholar and researcher.

Because an allegation that an academic has falsified his results is so damaging,

Lott wrote Levitt on January 11, 2006 requesting, inter alia, that Levitt correct his claim

that other scholars have been unable to replicate Lott's results. Lott, through his counsel,

wrote Levitt and HarperCollins on March 17, 2006 requesting that all future printings of

"Freakonomics" correct the defamatory statement in the form of a retraction. Lott did not

receive a substantive response to either letter. Accordingly, he filed this action on April

10, 2006.

## ARGUMENT

### I.   DEFENDANTS' REPLICATION STATEMENT IS AN "OBJECTIVELY VERIFIABLE FACT" AND THEREFORE NOT CONSTITUTIONALLY PROTECTED OPINION

#### A.   The Legal Standard

Defendants argue that the passage from "Freakonomics" on which this lawsuit is based is a constitutionally protected expression of opinion.  But Defendants ignore the pivotal issue for determining whether the passage is protected, namely, whether the passage is "objectively verifiable."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 22 (1990).  Defendants also fail to address on point case law that provides an analytical framework for determining whether the passage is verifiable.  Further, they glide over the defamatory words at issue.  Once the legal issue is framed correctly and the actual words at issue are analyzed, it is transparent that there is no constitutional protection here.

The core legal principles flow from the Supreme Court's decision in Milkovich. The Supreme Court rejected the argument that a statement that alleged perjury was constitutionally protected and, in doing so, articulated three fundamental legal principles – all of which are either ignored or glossed over in Defendants' motions.

First, there is no separate constitutional privilege for statements of opinion.  Id. at 18-21.  As the Court noted, "expressions of 'opinion' may often imply an assertion of objective fact."  Id. at 18.[4]

Second, a statement is not constitutionally protected from a defamation action if it is "provable as false."  The Court stated as follows:

---

[4] This point was recognized by the Illinois courts in Hopewell v. Vitullo, 299 Ill. App. 3d 513, 518, 701 N.E.2d 99, 103 (1st Dist. 1998) where the appellate court stated that "in Milkovich v. Lorain Journal Co. (citiation omitted), the Supreme Court rejected this dichotomy between opinion and fact and asserted that there no longer is a separate first amendment privilege for statements of opinion."

Foremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, as least in situations, like the present, where a media defendant is involved. Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

Next, the *Bresler-Letter Carriers-Falwell* line of cases provides protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. (Citations omitted.) (Emphasis added.)

Id. at 19-20. Writing for the majority, Chief Justice Rehnquist held that a statement that someone had committed perjury was "sufficiently factual to be susceptible of being proved true or false." Id. at 21.

And third, the Court noted there is "another side to the equation" regarding the First Amendment's guarantee of free speech on public issues -- that is the right of a person to seek redress for defamatory attacks on his reputation. Quoting an earlier decision, the Court emphasized the "'important social values which underlie the law of defamation,'" and stated that "'society has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" Id. at 22 (quoting Rosenblatt v. Baer, 383 U.S. 75, 86 (1966)).

The Seventh Circuit restated the ruling in Milkovich on protected speech as follows:

A statement of fact is not shielded from an action for defamation by being prefaced with the words "in my opinion," but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.

Haynes v. Knopf, Inc. 8 F.3d 1222, 1227 (7th Cir. 1993) (emphasis added)[5]; see also

Republic Tobacco Co. v. N. Atl. Trading Co., Inc., 381 F.3d 717, 729 (7th Cir. 2004)

("Czerewko is claiming to be in possession of objectively verifiable facts that could

easily be evaluated in a defamation suit.").

    Importantly, the Illinois Supreme Court has articulated a multifactor test for

evaluating whether a statement is constitutionally protected.[6] It summarized the test less

than a month ago in Solaia Technology, LLC v. Specialty Publishing Co., 2006 Ill.

LEXIS 1088 at *33-34 (Ill. June 22, 2006) (factors to consider are whether statement has

a precise meaning and readily understood meaning, is statement verifiable, and the

literary and social context); see also Mittelman v. Witous, 135 Ill.2d 220, 243, 552 N.E.

2d 973, 984 (Ill. 1989) (adopting multifactor test); Hopewell, 299 Ill. App. 3d at 518-19,

701 N.E. 2d at 103-04 (same).

    The courts in this district have embraced and applied the multifactor test in

numerous decisions. For example, in Brown v. GC America, Inc. 2005 U.S. Dist. LEXIS

28065 (Nov. 15, 2005), Judge Manning stated as follows:

> More specifically, a statement is protected by the First Amendment only if
> cannot be "reasonably interpreted as stating actual facts." (citations
> omitted). Four considerations are relevant when considering whether this
> requirement has been met: (1) does the language have a precise and
> readily understood meaning, or is the language at issue loose, figurative,
> rhetorical, or hyperbolic, thus negating the impression that it presents
> actual facts?; (2) does the general tenor of the context in which the
> statement appears negate the impression that the statement has factual
> content?; (3) is the statement objectively verifiable as true or false?; and
> (4) does the social context and setting in which the statement was
> published support a conclusion that readers would readily consider the
> statement to be opinion, not fact. (citations omitted).

---

[5] We agree with Defendants that Illinois law governs this dispute.

[6] Oddly, Defendants make no reference to this on-point test.

Id. at *22-23; see also Newman v. Hansen & Hempel Co., 2002 U.S. Dist. LEXIS 21233

at * 25-27 (Nov. 1, 2002) (N.D. Ill.) (Aspen, J.) (same); Drury v. Sanofi-Synthelabo Inc.,

292 F. Supp. 2d 1068 at *3 (N.D. Ill.) (Bucklo, J.) (same); Gosling v. Conagra, Inc., 1996

U.S. Dist. LEXIS 5356 at *11-14 (N.D. Ill. Apr. 23, 1996) (Coar, J.) (same); Hach v.

Laidlaw Transit, Inc. 2004 U.S. Dist. LEXIS 24047 at *2-5 (N.D. Ill. Nov. 24, 2004)

(Grady J.) (same); Wilkow v. Forbes, Inc. 2000 U.S. Dist. LEXIS 6587 at *35-36 (N.D.

Ill. May 15, 2000) (Manning, J.) (same); Skolnick v. Correctional Medical Services, Inc.,

132 F. Supp. 2d 1116 (N.D. Ill. 2001) (Norgle, J.) (same); Naylor v. Rockford Park

District, 1999 U.S. Dist. LEXIS 1264 at *12 (N.D. Ill. July 14, 1999) (Reinhard, J.)

(same).

### B.        Defendants' Replication Statement Is Verifiable

When the legal issue is correctly framed, there is not a shred of doubt that the

statement at issue is not constitutionally protected. The statement reads: "When other

scholars have tried to replicate his results, they found that right-to-carry laws simply

don't bring down crime." "Freakonomics," p. 134. This is not "loose, figurative, or

hyperbolic language" that would suggest it is purely a matter of opinion. Milkovich, 497

U.S.at 21. Rather, it can "reasonably [be] interpreted as stating actual facts." Id. at 20.

Or to use Chief Judge Posner's words, it involves "objectively verifiable facts." Haynes,

8 F.3d at 1227.

Defendants' statement is either true or false. Scholars who tried to replicate

Lott's results either did or did not find that right-to-carry laws bring down crime. The

truth or falsity of Defendants' statement can readily be determined by looking at the

articles written by scholars who tried to replicate Lott's results to see if they found that right-to-carry laws do or do not bring down crime.

Such a review is much easier than the factual investigation involving the comparison of testimony contemplated by the Supreme Court in Milkovich. There the Court stated:

> We also think the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false. A determination whether petitioner lied in this instance can be made on a core of objective evidence by comparing, *inter alia*, petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court."

Milkovich, 497 U.S. at 21. Similarly, in Republic Tobacco Co. v. Atlantic Trading Co., Inc., 381 F.3d 717 (7th Cir. 2004), the Seventh Circuit held that statements in a letter alleging that the writer's company owned certain patent rights and that those rights had been violated were objectively verifiable. A jury in the instant case can determine whether Defendants' statement is true or false just as a jury in Republic Tobacco could have determined whether a patent or trademark was violated.[7]

We get the same result if we apply Illinois' multifactor test. We analyze each factor below.

The statement has a precise and readily understood meaning. The sentence at issue is readily understood and does not use any language that might lead the reader to think the authors are expressing their opinion. The meaning of the sentence is informed by the word "replicate" which has a well-understood meaning meaning. An examination of several dictionary definitions confirms this. See, Mittelman, 135 Ill. 2d at 244, 552

---

[7] We note that, as a practical matter, there wasn't a factual dispute in Republic Tobacco as to whether these facts were true or false. Nevertheless, the court clearly ruled that factual issues such as the validity of a patent could be resolved by a jury.

N.E. 2d at 984 (stating that dictionary definitions are helpful in resolving the "opinion/fact dichotomy").

For example, <u>Webster's New World College Dictionary</u> (4th ed. 2004) defines "replicate" and "replication," in pertinent part, as follows:

> replicate:
>
>  to repeat, duplicate, copy, or reproduce
>
> replication:
>
> *Statistics* <u>the exact duplication of an experiment for verification, criticism, or extension of previous results.</u>  (Emphasis added.)

"Replicate" is defined in <u>Random House Webster's College Dictionary</u> (2001), in pertinent part, as follows:

> 1. <u>to repeat, duplicate, or reproduce</u> – [intransitive verb] 3. to undergo replication. – [noun] 4. something, as a scientific experiment, that can be replicated.  (Emphasis added.)

And finally, "replicate" is defined in <u>Merriam-Webster Online</u>,  in pertinent part, as follows:

> *transitive verb*: <u>Duplicate, Repeat</u> <replicate a statistical experiment> (Emphasis added.)

<u>Merriam-Webster Online</u> defines replication as "the action or process of reproducing or duplicating <*replication* of DNA> <viral *replication*> (www.m-w.com/dictionary); <u>see, also</u>, <u>MSN Encarta Dictionary</u> ("do something again: to make an identical version of something repeatedly and exactly, or do something again in exactly the same way") (http://encarta.msn.com/dictionary_/replicate.html); <u>Cambridge Advanced Learner's Dictionary</u> (Cambridge University Press 2d ed. 2005) ("to make or some something again

in exactly the same way: *Researchers tried many times to replicate the original experiment*") (http://dictionary.cambridge.org/define.asp?key=67004&dict=CALD).

"Replicate" in the context of economics and statistics has the same meaning of duplication or repetition. Thus, for example, in a recent article by John J. Donohue (a frequent co-author with Levitt) and Justin Wolfers entitled "The Ethics and Empirics of Capital Punishment: Uses and Abuses of Empirical Evidence in the Death Penalty Debate" 58 Stan. L. Rev. 791 (2005), the authors state that several other scholars "generously provided us with their 1950 to 1990 dataset, so we were easily able to replicate their results." Id. at 811.[8] See also, W. G. Dewald, J. G. Thursby & R. G. Anderson, "Replication in Empirical Economics: The Journal of Money, Credit and Banking Project," The American Economic Review 587 (September 1986) ("The confirmation of research findings through replication by other researchers is an essential part of scientific methodology. William Broad and Nicholas Wade in Betrayers of Truth (1983) present examples wherein the inability of other researchers to replicate published scientific findings revealed both inadvertent errors and outright fraud.")

The literary context in which the statement appears confirms that the statement has factual content. The context of statement at issue can leave the reader with only one conclusion – the authors intended it to have factual content. The authors tie their statement about replication to the findings of other scholars. Findings are facts – not opinions. Further, the authors purport to buttress the factual accuracy of their statement through the use of a note appearing on page 221. The note reads:

---

[8] We will show in discovery (if the Court permits the case to proceed) that Levitt uses the word "replicate" in precisely the same way. In so doing, he was fully aware of the meaning of "replicate" when he used it with reference to Lott.

> **133-34 Lott's gun theory disproved:** See Ian Ayres and John J. Donohue III, "Shooting Down the 'More Guns, Less Crime' Hypothesis," *Stanford Law Review* 55 (2003), pp. 1193-1312; and Mark Duggan, "More Guns, More Crime," *Journal of Political Economy* 109, no. 5 (2001), pp. 1086-1114.

The context clearly leads the reader to believe that the veracity of the replication statement is confirmed through the scholarly articles cited in the above note. Further, the inability to replicate statement is preceded by a sentence stating "there was the troubling allegation that Lott actually invented some of the survey data that supports his more-guns/less-crime theory." "Freakonomics," pp. 133-34. This sentence, although couched in the language of allegation, as opposed to fact, is designed to raise doubt about Lott's integrity as an economist.[9] This context leaves the reader to conclude that the replication sentence, which is not accompanied by "allegation," is intended to be understood as fact, not opinion.

<u>The statement is objectively verifiable as true or false</u>. As demonstrated above, the statement that other scholars were unable to replicate Lott's results can easily be verified as true or false. Even if Defendants confronted this issue, which they fail to do, and contended the statement can't be verified, they would plainly be wrong. The first place to look in assessing the veracity of Levitt's replication statement is the two articles cited above. Neither article states or implies that Lott's results couldn't be replicated.[10] Next, it will be a relatively easy matter to assemble all of the articles where the author attempts to replicate Lott's results. These articles could then be read to determine whether or not they failed, as Levitt states, to replicate Lott's results.

---

[9] This allegation is also false.

[10] In fact, Duggan's article states that "[t]he first set of specifications, summarized in column 1 of table 12, replicate the Lott-Mustard results." Mark Duggan, "More Guns, More Crime," <u>Journal of Political Economy</u>, 1086, 1109 (2001).

The social context in which the statement was published supports the conclusion that readers would consider the statement to be fact.   The authors of "Freakonomics" claim that they use the tools of science of economics, numbers and statistics to shed light on public policy issues.   While the book raises many provocative questions, the underlying economic analysis used to answer questions of public policy is framed in terms of using data and the rigors of economic analysis to arrive at scientific truth, not opinion.   The following excerpt from the introduction establishes this point:

> What this book *is* about is stripping a layer or two from the surface of modern life and seeing what is happening underneath.   We will ask a lot of questions, some frivolous and some about life-and-death issues.   The answers may often seem odd but, after the fact, also rather obvious.   We will seek out these answers in the data – whether those data come in the form of schoolchildren's test scores or New York City's crime statistics or a crack dealer's financial records.   (Or we will take advantage of patterns in the data that were incidentally left behind, like an airplane's sharp contrail in a high sky.)   It is well and good to opine or theorize about a subject, as humankind is wont to do, but when moral posturing is replaced by an honest assessment of the data, the result is often a new, surprising insight.

> Morality, it could be argued, represents the way that people would like the world to work – whereas economics represents how it actually *does* work.   Economics is above all a science of measurement.   It comprises an extraordinarily powerful and flexible set of tools that can reliably assess a thicket of information to determine the effect of any one factor, or even the whole effect.

> . . .

> If you learn look at the data in the right way, you can explain riddles that otherwise might have seemed impossible.   Because there is nothing like the sheer power of numbers to scrub away layers of confusion and contradiction.

"Freakonomics," pp. 13-14 (emphasis added).   This summary of the authors' general approach further confirms that their replication statement is to be understood as factual, not opinion.

## C.     Defendants' Other "Opinion" Arguments Don't Hold Water

Defendants' First Amendment arguments are largely based on the false premise

that this action is based on a disagreement over whether right-to-carry laws reduce the

rate of violent crime. But the complaint makes it crystal clear that this action is based on

Defendants' false accusation that other scholars have been unable to "replicate" Lott's

results. In other words, it is an action about Lott's methodology, not his conclusions.[11]

Defendants erroneously rely on a group of cases involving criticism of "a

scholar's ideas," which hold that this is "quintessentially protected opinion" and that this

principle applies "with special force to statements disputing scientific theories or results."

HarperCollins' Mot., p. 6 & 7. But this case is not about the clash of scholarly opinions

on the subject of gun control. Thus, Defendants' argument and case law on this point are

irrelevant. See, e.g., Dilworth v. Underwood Dudley, 75 F.3d 307 (7th Cir. 1996)

(mathematician alleged that an engineer who published an article in a scholarly journal

based on an allegedly faulty idea was a "crank");[12] Underwager v. Salter, 22 F.3d 730 (7th

Cir. 1994) (scientific dispute over the legitimacy of allegations of child sexual abuse);

---

[11] For example, the complaint states at Paragraph 11 that "[w]hile other scholars have used different data or methods to analyze the relationship between gun control laws and crime, and in some cases have reached a different conclusion that has lead them to disagree with Lott's conclusion, no scholar who has replicated Lott's statistical analysis has concluded that the data and methods on which he relied don't support his conclusion."

[12] In Dilworth, Chief Judge Judge Posner draws a crucial distinction between a scholar who is falsely accused of an act of "serious misconduct" such as plagiarism, sexual harassment or inflating his or her grades, and a scholar who is accused of having "unsound ideas." In the former case, the scholar "has the same right to damages as any other victim of defamation. The case before us is one in which not the character but the ideas of the scholar are attacked." 75 F.3d at 310. The instant case falls in the category of "serious misconduct," not "unsound ideas." Given the plain meaning of the word "replicate," namely the "exact duplication of an experiment for verification, criticism, or extension of previous results" (Webster's New World College Dictionary (4th ed. 2004), Levitt's replication statement, particularly when read in the context of the previous statement relating to allegation that Lott "actually invented some of the survey data that support his more-guns/less-crime theory" can only be read to mean that other scholars have been unable to replicate Lott's results because he falsified his results. If true (which it is not), this would unquestionably constitute "serious misconduct."

Ezrailson v. Rohrich, 65 S.W. 3d 373, 382 (Tex. App. 2001) ("The article expressed disagreement with Ezrailson's medical science ideas"); Guitar v. Westinghouse Elec. Corp., 396 F. Supp. 1042 (S.D.N.Y. 1975), aff'd, 538 F.2d 309 (2d Cir. 1976); (broadcast review attacking author's book opposing urbanization of suburbs was protected opinion); Lane v. Random House, Inc., 985 F. Supp. 141 (D.D.C. 1995) (not defamatory to criticize conspiracy theorist's views on the assassination of President Kennedy); Underwager v. Channel 9 Australia, 69 F.3d 361, 367 (9th Cir. 1995) ("[T]he statement is no more than nonactionable 'rhetorical hyperbole, a vigorous epithet used by those who considered [the appellant's] position extremely unreasonable'"); Kirk v. CBS, Inc., 1987 U.S. Dist. LEXIS 4607 at *13 (N.D. Ill. June 4, 1987) ("CBS's expression of its opinion as to the merits of the treatment [of cancer] cannot sustain a cause of action in defamation"); Spelson v. CBS, Inc., 581 F. Supp. 1195 (N.D. Ill. 1984) (attack in broadcast on efficacy of chiropractor's cancer treatment practices alleged to be "cancer quackery" was protected opinion); Freyd v. Whitfield, 972 F. Supp. 940, 945 (D. Md. 1997) ("His beliefs in the viability of repressed memory syndrome . . . qualify as constitutionally protected opinion").

Defendants' attempt to inoculate the replication statement with constitutional immunity by focusing on context also fails to pass muster. HarperCollins' Mot. pp. 7-9. For one thing, the argument ignores the statement itself – in fact, Defendants fail to address the word "replicate, substituting "substantiate" – a word with a very different meaning – and putting "replicate in parentheses – suggesting, erroneously, that the words have identical meanings.[13] By ignoring their actual statement itself, Defendants evade

---

[13] Webster's New World College Dictionary (4th ed.) defines "substantiate" as follows:

the fundamental issue here, namely, whether the replication statement contains "objectively verifiable facts." Haynes, 8 F.3d at 1227.[14]

For another, Defendants' contextual argument is framed in terms of a vigorous debate about gun control. Indeed, they devote several pages of their brief to this false assertion. But this, like their substitution of the word "substantiate," is pure evasion. As discussed above, the multifactor test asks whether the literary and social context sheds light on whether the alleged defamatory statement is factual. Defendants fail to address this pivotal issue – no doubt because it leads, inescapably, to the conclusion that the replication statement can only be understood one way – as a statement of fact.

And finally, Defendants try to evade their own words by arguing that the replication statement does not specifically say that other scholars "followed precisely the protocols used by Plaintiff." HarperCollins' Mot. p. 9. However, the dictionary definition of "replicate" makes it perfectly clear that this is precisely what the word means.[15]

---

1 to give substance or true existence to 2 to give concrete form or body to; convert into substance; embody 3 to show to be true or real by giving evidence; prove; confirm.

This is fundamentally different than the "exact duplication of an experiment for verification, criticism, or extension of previous results." Id.

[14] We also note that while Illinois' multifactor approach for assessing this issue includes contextual considerations, the key factor is verifiability. See, e.g., Hopewell, 299 Ill. App. 3d at 519, 701 N.E. 2d at 103 ("While this approach considers the context within which the alleged defamatory statement appears, its emphasis is on whether the statement contains an objectively verifiable assertion"); Skolnick, 132 F. Supp. 2d at 1125 ("The emphasis is on the totality of the circumstances, and whether the statement can be reasonably interpreted as stating actual facts or objectively verified as true or false").

[15] According to Defendants' lights, a false allegation of plagiarism wouldn't be defamatory unless the statement also contained the definition of plagiarism. That is not the law as shown by the case law in this area in which the courts routinely examine dictionary definitions to understand the meaning of words. Mittelman, 135 Ill.2d 244, 552 N.E.2d at 984 ("We also believe the dictionary definitions we have cited will be helpful in addressing the admittedly troublesome opinion/fact dichotomy"); Hach, 2004 U.S. Dist. LEXIS 24047 at *9.

In sum, there is simply no merit to Defendants' opinion argument. Their replication statement involves "objectively verifiable facts," and therefore is not constitutionally protected from a defamation action.

## II.    THE REPLICATION STATEMENT IS DEFAMATORY *PER SE*

### A.    The Legal Standard

Defendants argue that their replication statement is not, as alleged in the complaint, defamatory *per se* because it requires extrinsic evidence to be understood and because, under the "innocent construction rule," it has a benign alternative meaning. But these arguments, like Defendants' First Amendment argument, erroneously focus on the debate over right-to-carry laws rather than the defamatory replication statement, and ignore the plain meaning of Defendants' statement.

A defamatory statement can be defamatory *per se*, and therefore not require proof of special damages, if it falls into one or more of four categories established at common law.[16] In order for a statement to qualify as defamatory *per se,* it may not depend upon extrinsic facts to explain its meaning, Middleman, 135 Ill. 2d at 233, 552 N.E. 2d at 979, but must be "so obviously and naturally harmful to the person to whom it refers that a

---

[16] The four categories are set forth in Mittelman, 135 Ill. 2d at 238-39, 552 N.E. 2d at 982 as follows:

> Words are considered defamatory *per se* in Illinois if they: (1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute inability to perform or want of integrity in the discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his trade, profession or business.

Lott alleges at Paragraph 14 of his complaint that Defendants' statement is defamatory *per se* because it "attacks [his] integrity and honesty in his profession as an economist, scholar and researcher . . . damages [his] reputation in the eyes of the academic community in which he works, and in the minds of the hundreds of thousands of academics, college students, graduate students, and members of the general public who read "Freakonomics."

showing of special damages is unnecessary." Owen v. Carr, 113 Ill. 2d 273, 277, 497 N.E. 2d 1145, 1147 (Ill. 1986).

A statement will not be defamatory *per se* if it is "reasonably capable of an innocent construction." Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 90, 672 N.E.2d 1207, 1215 (Ill. 1996). However, in applying the innocent construction rule, the "courts must give the allegedly defamatory words their natural and obvious meaning." Id. at 93, 672 N.E. 2d at 1217. In order to assess whether this rule applies, the court may look at preceding sentences (Id. at 93, 672 N.E. 2d at 1217) and dictionary definitions. Mittelman, 135 Ill. 2d at 247, 552 N.E. 2d at 986.

## B. **Extrinsic Evidence is Not Required**

Defendants argue that the meaning attributed in the complaint to the replication statement is extrinsic evidence, thereby disqualifying the statement as defamatory *per se*.[17] HarperCollins' Mot. pp.12-13. But the Court need go no further than the dictionary definitions quoted above to conclude that Defendants' statement is defamatory *per se*. Those definitions state the same meaning of replication that is set forth in the complaint. Thus, if we replace "replicate" with its dictionary definition, the statement reads:

> When other scholars have tried to exactly duplicate Lott's results for
> verification purposes they found that right-to-carry laws simply don't
> bring down crime.

---

[17] At Paragraph 12 of the Complaint, Lott states: "The term 'replicate' has an objective and factual meaning in the world of academic research and scholarship. When Levitt and Dubner allege that 'other scholars have tried to replicate his results,' the clear and unambiguous meaning is that 'other scholars' have analyzed the identical data that Lott analyzed and analyzed it the way Lott did in order to determine whether they can reach the same result."

This statement, particularly when read along the two immediately preceding sentences suggesting that Lott invented survey data, clearly discredit Lott in his profession. Accordingly, the statement at issue is defamatory *per se*.

Defendants' "innocent construction" argument attempts to rewrite the replication statement into meaning that "other scholars have disagreed with Plaintiff's conclusions and that Plaintiff's *hypothesis* 'doesn't seem to be true.'" HarperCollins' Mot. p.13. But this is revision, not construction because Defendants conveniently read out the key words "[w]hen other scholars have tried to replicate his results." As noted above, the innocent construction rule requires that the court "give the <u>allegedly defamatory words</u> their natural and obvious meaning." <u>Bryson</u>, 174 Ill. 2d at 93, 672 N.E. 2d at 1217 (emphasis added). Defendants' argument not only fails to give the words "tried to replicate" their "natural and obvious meaning," it ignores the words altogether.[18]

Further, when the replication statement is read in the context of the two preceding sentences, both of which deal with allegations that Lott invented survey data, the reader is lead, inescapably, to the conclusion that other scholars were unable to replicate Lott's results because he falsified the data.

---

[18] The case law on which Defendants rely provides no support for their position. In fact, all of Defendants' cases grapple with the alleged defamatory words at issue, and no case reads out the alleged defamatory words. <u>See</u>, <u>Green</u> v. <u>Trinity Int'l University</u>, 344 Ill. App. 3d 1079, 801 N.E. 2d 1208 (2nd Dist. 2003) (holding that statements that students had complained about a professor and that the university discussed the complaints with the professor could reasonably be construed to mean that the professor did not "fit in" or that his philosophies "did not mesh" with the university); <u>Harlem Corp.</u> v. <u>Kraft</u>, 273 Ill. App. 3d 388, 652 N.E. 2d 1077 (1st Dist. 1995) (holding that opthamologist's statement in newsletter critiquing a form of cataract surgery could be reasonably construed as advocating the need for further research, and not that Plaintiff engaged in harmful surgical practices); <u>May</u> v. <u>Myers</u>, 254 Ill. App. 3d 210, 626 N.E. 2d 725 (3rd Dist. 1993) (court reads "statement as a whole"); <u>Haberstroh</u> v. <u>Crain Publications, Inc.</u>, 189 Ill. App. 3d 267, 545 N.E. 2d 295 (1st Dist. 1989) (construing statements regarding political affiliation and drug use as having a non-defamatory meaning.

And finally, Defendants' argument that Plaintiff can't "rewrite" the replication statement to avoid the innocent construction rule (HarperCollins' Mot. p. 14), fails because the alleged "rewrite" is nothing more than a statement of the ordinary meaning of the word "replicate."

Plainly, Defendants' *per se* arguments are without merit and should be rejected.

### III.     LEVITT'S E-MAIL CONTAINS "OBJECTIVELY VERIFIABLE FACTS" AND IS DEFAMATORY *PER SE*

#### A.     Levitt's E-Mail Is Not Constitutionally Protected Opinion

Levitt argues that the e-mail he sent to an economist in Texas, and which forms the basis of Count Two of the Complaint, is constitutionally protected because it uses "nonactionable rhetorical hyperbole." Levitt Mot. p.3. Levitt, again, fails correctly to analyze the legal issue. Whether or not a statement is constitutionally protected must be analyzed by assessing whether the statement is based on "objectively verifiable facts." Haynes, 8 F.3d at 122. As discussed above, this issue is resolved by applying Illinois' multifactor test. All of statements in the e-mail that we allege are defamatory can be objectively verified.

Was this issue of The Journal of Law & Economics Peer Refereed? The term "peer refereed" has "a precise and readily understood meaning." Solaia Technology, 2006 Ill. LEXIS 1088 at *33. "Peer refereed" is described as follows:

> Scientists invite peer review by submitting manuscripts describing their studies to the editor of a scientific journal. To determine whether the manuscript merits publication, the editor will ask two or three qualified scientists (the author's "peers") to referee the paper for conformity to scientific standards. Based on the work's merits, each editor recommends whether the manuscript should be published, revised after additional experimentation, or rejected outright.

Diana K. Sheiness, "Notes & Comments: Out of the Twilight: The Implications of Daubert v. Merrell Dow Pharmaceuticals, Inc.," 69 Wash. L. Rev. 481 n. 49 (1994). The term is frequently used in scholarly articles. See, Michele L. Dauber, "Response & Reply: The Big Muddy," 57 Stan. L. Rev. 1899, 1914 (2005) ("Unlike the Utah chemists' claims about cold fusion, there is no peer-refereed journal on which the public can rely for a neat resolution on the merits of Sander's claim about affirmative action"); Peter H. Huang, "Lawsuit Abandonment Options in Possibly Frivolous Litigation Games, 23 Rev. Litig. 47 55 (2004) ("Proof of the acceptance of game-theordic reasoning in the legal scholar's toolkit is found in the five peer- refereed journals about law and economics"); Michael Bacchus, "Comment: Strung Out: Legal Citation, The Bluebook and the Anxiety of Authority," 151 U. Pa. L. Rev. 245, 273 (2002) ("In contrast to the academic journals of other disciplines, academic legal journals are not peer-refereed, but, rather, are edited by students").

Further, Levitt's statement is easily verifiable. Most of the scholars who wrote articles that appear in the Special Issue have a footnote in their article specifically thanking a referee for making helpful comments. See, e.g., Jeffrey A. Miron, "Violence, Guns, And Drugs: A Cross-Country Analysis," Special Issue at 615 (thanking "anonymous referee for comments on an earlier draft"); Jeffrey S. Parker, "Guns, Crime, And Academics: Some Reflections On The Gun Control Debate," Special Issue at 715 (same); Bruce L. Benson & Brent D. Mast, "Privately Produced General Deterrence," Special Issue, p. 725 (same); David E. Olson & Michael D. Maltz, "Right-To-Carry Concealed Weapon Laws And Homicide In Large U.S. Counties: The Effect On Weapon Types, Victim Characteristics, And Victim-Offender Relationships," Special Issue at 747

(same); Carlisle E. Moody, "Testing For The Effects Of Concealed Weapons Laws: Specification Errors And Robustness," Special Issue at 799 (same). Contributing authors and the editor of The Journal of Law & Economics (alleged by Levitt in his e-mail to be his "best friend") could be interviewed and, if necessary, deposed to determine whether the Special Issue was, in fact, peer reviewed.[19]

And finally, there is nothing about the literary or social context of Levitt's e-mail suggesting that it wasn't intended to be taken as a true statement, as opposed to Levitt's opinion. The statement is factual, and there is no "loose, figurative, or hypberolic language." Milkovich, 497 U.S. at 21. Nor is the fact that the statement was made in an e-mail a contextual factor that implied that its content was pure opinion.[20]

---

[19] Discovery in this area will also prove that Levitt knew that his replication statement in "Freakonomics" was false. For example, as Levitt's e-mail implies, he was fully aware that the articles that appeared in the Special Issue were by scholars who had replicated Lott's results on the effect of right-to-carry laws. When McCall pointed to the Journal and the articles that had replicated Lott's research, Levitt's response was not that those studies did not replicate Lott's research, but that those articles didn't count because they weren't peer refereed and because Lott had paid off the publisher to print them.

[20] A recent decision of the federal district court in the District of Columbia on the use of e-mails dispels any suggestion that communicating via e-mail is a contextual factor indicating the views are purely a matter of opinion. In Houlahan v. World Wide Ass'n of Specialty Programs and Schools, 2006 U.S. Dist. LEXIS 17093 (D.D.C. Mar. 28, 2006), the United States District Court for the District of Columbia held as potentially defamatory the statement that "honesty is not one of [plaintiff's] characteristics to say the least" . . . and [his] approach will sell press today but with disregard for truth and honesty in obtaining his pay check." The district court, which applied the same multifactor test that is used in Illinois (Ollman v. Evans, 750 F.2d 970, 979 (D.C. Cir. 1984)), held:

> Landre's intended message is clear: that Houlahan is a liar. Landre's comments are analogous to the "John Jones is a liar" illustration used by the *Milkovich* court, and therefore require the same conclusion -- the statement implies a factual underpinning.

Id. at *9. The district court also held that the defendant's suggestion in his e-mail that, because of his position and expertise he was aware of facts that were unavailable to the general public, reinforced the conclusion that he was making factual assertions. Id. at *11. Levitt did precisely the same thing in his e-mail by stating that he had obtained information from his friend – the editor -- relating to Lott's role in the Special Issue. Such "insider" information would not be available to the general public and underlines the factual content of Levitt's e-mail. The D.C. district court held that because the e-mail "implies the factual assertion that Houlahan made untrue statements,"defendant's motion to dismiss should be denied. The same result should apply here.

Did Lott "buy an issue" and put in "only work that supported him?" Nor is there any ambiguity about Levitt's accusation that Lott "was able to buy and issue and put in only work that supported him." The words "buy" and "support" have precise and readily understood meanings. There is nothing "figurative" here.[21] Levitt's Mot. p. 3. Levitt's is clearly alleging that Lott improperly paid money to The Journal so that all of the articles in the Special Issue supported him. The truth or falsity of this statement can also be easily determined by deposing the editor and anyone else involved in publishing the issue. And as discussed above, there is nothing about the context in which the e-mail was written suggesting that it wasn't to be taken as true.[22]

### B. Levitt's E-Mail Is Defamatory *Per Se*

Levitt's e-mail is defamatory *per se* because it was clearly intended to convey the factual statement that Lott had acted improperly by paying money to get an issue of a respected academic journal published that contained only articles favorable to Lott. Such a statement plainly damages Lott in his reputation as a scholar. That Levitt is claiming that Lott engaged in improper behavior is reinforced by Levitt's statement that The Journal's editor was "outraged the press let Lott do this."

---

[21] These words are very different than the types of disparaging words that are typically categorized as hyperbolic. *See, e.g.,* Hopewell, 701 N.E. 2d at 102 ("fired because of incompetence"); Brown v. GC America, Inc., 2005 U.S. Dist. LEXIS at *24 (manufacturing company "'all f—ed up' because [plaintiff] was in charge of professional relations and could not solicit articles and get them published").

[22] This point is underlined by the fact that Levitt's e-mail is a response to a specific, factual question posed by another economist who wrote Levitt as follows:

> I went to the website you recommended – have not gone after the round table proceedings yet –

> I also found the following citations – have not read any of them yet, but it appears they all replicate Lott's research. The Journal of Law and Economics is not chopped liver.

> Have you read through any of these? http://johnrlott.tripod.com/postsbyday/RTCResearch.html.

Complaint ¶ 19.

Levitt tries to deflect the obvious by reasserting his extrinsic evidence and innocent construction rule arguments. But extrinsic evidence is not required to explain the meaning of "peer refereed," particularly to a recipient who is an economist. Complaint, ¶ 18. Nor is extrinsic evidence necessary to establish the proposition that it is unethical to pay off the publisher of a respected academic in order to produced a one-sided issue. This is pure commonsense, and would certainly be understood by a recipient who is an economist and a reader of academic journals.

Finally, Levitt's innocent construction argument that since "the press let Lott do this," there is no allegation of impropriety falls flat. The innocent construction rule requires the court to "consider a written or oral statement in context, giving the words, and their implications, their natural and obvious meaning." Bryson, 174 Ill. 2d at 90, 672 N.E.2d at 1215. Levitt's words have only one "natural and obvious meaning" and that is that Lott improperly used money to produce a biased academic journal.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' motions to dismiss should be denied and this action allowed to proceed.

Respectfully submitted,

s/Stephen H. Marcus, Esq.
Law Office of Stephen H. Marcus
1050 17th Street, N.W.
Suite 600
Washington, D.C. 20036

Tele:  202-776-0651
Fax:   202-331-7272

Thomas A. Vickers, Esq.
Daar, Vickers & Masini, P.C.
225 W. Washington Street
18th Floor
Chicago, Illinois 60606

Tele: 312-224-1500
Fax: 312-224-15150

Counsel for Plaintiff John R. Lott, Jr.

July 10, 2006

## CERTIFICATE OF SERVICE

I, Stephen H. Marcus, Esq., hereby certify that on July 10, 2006, I served the

foregoing Opposition on the persons identified below by first-class mail, postage prepaid

and by facsimile:

>Slade R. Metcalf, Esq.
>Gail C. Gove
>Hogan & Harston
>875 Third Avenue
>New York, N.Y. 10022

>David P. Sanders, Esq.
>Wade A. Thomson, Esq.
>Jenner & Block
>One IBM Plaza
>Chicago, Ill. 60611

s/ Stephen H. Marcus
Stephen H. Marcus