IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN R. LOTT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06 C 2007 |
| v. | ) | |
| | ) | Judge Castillo |
| | ) | |
| STEVEN D. LEVITT and | ) | Magistrate Judge Levin |
| HARPERCOLLINS PUBLISHERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**

Defendants HarperCollins Publishers LLC (f/k/a HarperCollins Publishers Inc.) ("HarperCollins") and Steven D. Levitt ("Levitt") (collectively, "Defendants") submit this reply memorandum in further support of their motions to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

**Preliminary Statement**

Plaintiff's Opposition ("Opposition") gives scant treatment to Defendants' argument that the words complained of cannot be actionable under the Illinois innocent construction rule. (Opposition at 18-20.) There is a good reason for that: Plaintiff cannot show that the *only reasonable* meaning to be ascribed to the words at issue is that Plaintiff committed academic fraud. He simply cannot demonstrate that the words -- "When other scholars have tried to replicate [Lott's] results, they found that right-to-carry laws simply don't bring down crime" -- can only mean that Lott must have faked or manipulated his data to arrive at his results so that no

---

[1] For the convenience of the Court, Defendants submit one reply memorandum in further support of their respective motions to dismiss.

other scholar could replicate his methodology. On the contrary, one reasonable interpretation of that sentence is that other scholars attempted to arrive at the same conclusions as Lott had, but were unable to do so. Because the words complained of do not have an *exclusive*, reasonable defamatory *per se* meaning, the Complaint fails to state a claim.

Plaintiff's arguments to sustain Count I of the Complaint, which arises out of an excerpt in the book Freakonomics ("Book") about Plaintiff's "more guns/less crime" theory (the "Excerpt"), do not survive the scrutiny of the innocent construction rule because they depend on 1) a fundamental mischaracterization of the Excerpt as having to do with his research *methodology*, rather than his ultimate conclusions (*i.e.* his *results*), and 2) the faulty premise that the Book's audience would ascribe the same technical and academic-specific meaning to the term "replicate" as Plaintiff would. The Excerpt, however, expressly disclaims any judgments about Plaintiff's data, nowhere mentions his protocols or methodology, and focuses on Plaintiff's "*results*". The Book's audience consists of mainstream, everyday readers. To these readers, one reasonable meaning of the Excerpt is that other scholars disagree with or criticize Plaintiff's ideas. Because it is not susceptible to even one reasonable defamatory *per se* construction, let alone an *exclusive* defamatory *per se* construction that impugns Plaintiff's academic integrity, the Illinois innocent construction rule mandates dismissal of Count I. Further, as part of a controversy among scholars, namely, the reasons for a reduction in crime, the Excerpt constitutes a constitutionally-protected expression of opinion – the answer to which is more speech, not a lawsuit.

As to Count II of the Complaint, which arises out of an email allegedly sent by Defendant Levitt to an economist in Texas (the "E-Mail"), it is only by injecting a qualitative assessment into the E-Mail – which is absent from the text itself – that Plaintiff is able to arrive at even one

defamatory *per se* construction that accuses him of improper conduct. The E-Mail is susceptible to the reasonable non-defamatory *per se* construction that Plaintiff merely provided funding for the publication of articles which supported his position and that one individual disagreed with that decision. Moreover, these words are precisely the sort of loose, rhetorical language which cannot, under the First Amendment, sustain an action for defamation.

## ARGUMENT

### I. THIS COURT SHOULD DISMISS BOTH COUNTS OF THE COMPLAINT PURSUANT TO THE ILLINOIS INNOCENT CONSTRUCTION RULE.

#### A. The Excerpt Is Not Actionable Under the Illinois Innocent Construction Rule.

Plaintiff's Opposition fails to address the fundamental proposition that under Illinois law, the innocent construction rule mandates dismissal of a defamation *per se* claim if a plaintiff cannot show that the *exclusive* reasonable construction of the statement complained of is one that is defamatory *per se*.[2] Plaintiff pays little more than lip service to the innocent construction rule -- devoting only a few paragraphs to the rule which do not address the alternative, nondefamatory *per se* interpretations of the words complained of -- precisely because the rule provides clear grounds for dismissal of his Complaint.

As Defendants made clear in their opening briefs, Plaintiff cannot show, in the first instance, that the Excerpt is susceptible to even *one* reasonable defamatory *per se* construction. It is only by taking the Excerpt out of context, resorting to "extrinsic facts or innuendo" and

---

[2] No further discussion of the choice of law issue is necessary in this action. Defendants persuasively argued in their moving papers, and Plaintiff concedes, that Illinois law governs this action. Opposition at 8 n.5. See Harter v. Iowa Grain Co., 220 F.3d 544, 560 n.13 (7th Cir. 2000) (finding that Illinois law governed a contract dispute on summary judgment where an Illinois plaintiff assumed Illinois law applied and the Ohio defendant did not dispute the assumption; "Where the parties agree on the law that governs the dispute, and there is at least a 'reasonable relation' between the dispute and the forum whose law has been selected by the parties, we will forego an independent analysis of the choice-of-law issue and apply the parties' choice.") (citation and internal citation omitted). Both sides are in agreement that Illinois law applies and this State has a clear connection to the parties and the facts of this case.

3

supplanting the Excerpt with additional information that does not appear on its face that the Excerpt can be construed as meaning that Lott falsified his data or is guilty of academic dishonesty. Accordingly, because the Excerpt is not "so obviously and naturally harmful" to the plaintiff on its face that damage may be presumed, it cannot sustain a cause of action for libel *per se*. Anderson v. Vanden Dorpel, 172 Ill. 2d 399, 411-12, 667 N.E.2d 1296, 1301, 217 Ill. Dec. 720, 725 (1996); Mittelman v. Witous, 135 Ill. 2d 220, 232-33, 552 N.E.2d 973, 979, 142 Ill. Dec. 232, 238 (1989).

*Even if*, however, this Court finds that the Excerpt can reasonably be interpreted as an allegation that Plaintiff falsified his data and thus committed academic fraud, as Plaintiff contends, there can be no question that Plaintiff's meaning is not the *only* reasonable construction of the Excerpt.

The sole argument Plaintiff offers this Court as to why his claim arising out of the Book survives dismissal under the Illinois innocent construction rule is that the rule requires a court to give the words complained of their natural and obvious meaning. See Opposition at 20. While Defendants agree with that proposition, Plaintiff ignores the crucial point that the rule also requires a court to construe the allegedly defamatory statement *in context*, and if it concludes that the statement is susceptible to *any* reasonable non-defamatory *per se* construction, the libel *per se* claim is non-actionable as a matter of law and the court must dismiss the claim. Mittelman, 135 Ill. 2d at 232-33, 552 N.E.2d at 979, 142 Ill. Dec. at 238.

Here, it is Plaintiff, not Defendants, who asks this Court to attribute an unnatural meaning to the Excerpt wholly divorced from the context in which it appears. According to Plaintiff, the *only* reasonable meaning of the Excerpt's statement that "[w]hen other scholars have tried to replicate his results, they found that right-to-carry laws simply don't bring down crime," Book at

4

133-34, is that "when 'other scholars' tried to 'replicate' Lott's results, they analyzed the identical data that Lott analyzed and analyzed it the way Lott did, but were unable to replicate Lott's results." Opposition at 4; Compl. ¶ 12.[3] Based on that construction of the word "replicate," Plaintiff argues that "the reader is lead, inescapably, to the conclusion that other scholars were unable to replicate Lott's results because he falsified the data," and that the statement is an attack on "Lott's methodology, not his conclusions." Opposition at 15, 20.

Plaintiff's construction is so strained and based on faulty assumptions that it is inconceivable that his construction is the *exclusive*, reasonable interpretation of the Excerpt. The Excerpt is not about Plaintiff's *methodology*, as he alleges, but his "*results*." Not only is the Excerpt silent about Plaintiff's protocols and methodology, but Defendants know of no natural and obvious meaning of the word "results" that is tantamount to "methodology". Instead, the term "results" means just that – a finding or conclusion. Thus, the natural and obvious meaning of the Excerpt is simply that *for whatever reason*, other scholars arrived at a dissimilar conclusion than Lott did. The Book does not offer an explanation as to *why* other scholars could not come up with the same conclusion as Lott: they could have used different data, employed a different statistical analysis, or surveyed a different population group under very different socio-economic circumstances at a different point in time, or there could have been merely a computer malfunction. None of these reasonable, alternative constructions accuse Lott of academic dishonesty or otherwise impugn his professional integrity.

Equally as important, Plaintiff's *exclusive* construction is untenable in light of the Excerpt's context. While scholars and academics may certainly have read Freakonomics, the

---

[3] It is important to emphasize that Lott does not allege that other sentences in the Excerpt are false and defamatory as to him. Indeed, he does not base his claim on the sentence: "Then there was the troubling allegation that Lott actually invented some of the survey data that supports his more-guns/less-crime theory." Book at 133-34.

5

Excerpt appears in the context of a book whose audience consists of mainstream readers and consumers, as demonstrated by the fact that Freakonomics has been on the New York Times bestseller list for over a year. Therefore, while Plaintiff goes on at length to explain how in the eyes of an academic, the claim that other scholars could not replicate Lott's *results* is an allegation that Lott fabricated his *data*, see Opposition at 11-12, a reasonable reader in the general population would not necessarily attribute Plaintiff's academic-specific meaning to the term "replicate".[4]

It is not reasonable to conclude that the only meaning which readers could derive from the Excerpt is that the other scholars must have "analyzed the identical data that Lott analyzed and analyzed it the way Lott did", and then jump to the further conclusion that he therefore falsified his data. However, it *is* reasonable for such a reader to conclude that other scholars simply disagreed with Lott's ultimate conclusion and ideas based on entirely different data or methods. Further, examining the Excerpt in its more narrow context, it appears in a chapter dedicated to the broader controversial issue of gun control and the factors which cause a reduction in crime rates -- issues about which, as the Excerpt makes clear, reasonable minds can and do disagree. See Book at 133. Indeed, the Excerpt expressly communicates to the reader that Lott's "theory might be surprising, but it is sensible." Id. Moreover, the Excerpt removes the implication that the data were faked by specifically stating "regardless of whether the data were faked." In this context, there can be no question that the *sole* reasonable interpretation of the Excerpt is not an attack on Lott's academic integrity. Instead, it is indisputably susceptible to the reasonable, non-defamatory *per se* construction that *for whatever reason*, other scholars

---

[4] Plaintiff devotes much of his Opposition to dictionary definitions of the word "replicate", instead of focusing on the word "results", which is the operative word. The Excerpt says that other scholars could not replicate Lott's results, not that they could not replicate his methodology or data.

reached a different conclusion than Lott about whether allowing citizens to carry guns reduces crime.

Because Plaintiff's proposed construction is so distorted in light of the natural and obvious meaning of the actual words used and the Excerpt's context, the Excerpt is susceptible to reasonable, alternative interpretations that do not accuse Plaintiff of academic dishonesty in any way. Accordingly, this Court should dismiss Count I as against both Defendants HarperCollins and Levitt.

**B.     The E-Mail is Not Actionable Under the Illinois Innocent Construction Rule.**

To avoid operation of the innocent construction rule, Plaintiff claims, as he must, that the E-mail has *only one* meaning, and that is that Lott acted unethically or improperly in "pay[ing] off the publisher of a respected academic [sic] in order to produce a one-sided issue", or that "Lott improperly used money to produce a biased academic journal." Opposition at 24, 25.

It is impossible, however, for Plaintiff's meaning to be the *only* reasonable interpretation of the E-Mail because on its face, the E-Mail says nothing of the sort. The words "improper" and "biased" do not appear in the E-Mail; in fact, the only affirmative expression of disagreement with Lott's so-called "Special Issue" stems from Levitt's claim that his best friend "was outraged the press let Lott do this." Compl. ¶ 20. The E-Mail is therefore susceptible to the reasonable, non-defamatory *per se* construction that while a reputable academic journal (The Journal of Law & Economics) approved of Lott's "Special Issue," Levitt's friend personally objected to that decision. The fact that one individual looked unfavorably upon the "Special Issue" does not mean that all individuals would reach that same conclusion, or that it is somehow disreputable or unusual in the world of academia to publish an edition of a journal like the "Special Issue."

7

The remaining portions of the E-Mail are similarly subject to non-defamatory *per se* constructions. While the E-Mail states that Lott paid for a publication and put in "only work that supported him," because there is nothing inherently improper or unethical in doing so, this statement can be innocently construed to mean that Lott paid to arrange for a forum in which he could disseminate works which support his ideas. Similarly, the statement that "it was not a peer refereed edition of the Journal" is void of any stigma; there is nothing about publishing such an edition that is fraudulent, criminal or otherwise unethical such that the *only* reasonable interpretation of the statement is an attack on Lott's professional character.

Because the E-Mail can reasonably be interpreted in a fashion that does not accuse Plaintiff of any wrongdoing or lack of skill in his profession, under the Illinois innocent construction rule, Plaintiff cannot sustain a claim of defamation *per se* arising out of the E-Mail. Mittelman, 135 Ill. 2d at 232-33, 552 N.E.2d at 979, 142 Ill. Dec. at 238. As such, this Court should dismiss Count II of the Complaint.

**II.  COUNTS I AND II OF THE COMPLAINT SHOULD BE DISMISSED ON THE ADDITIONAL OR ALTERNATIVE GROUNDS THAT THEY ARE BASED ON CONSTITUTIONALLY PROTECTED EXPRESSIONS OF OPINION.**

Alternatively, Counts I and II of the Complaint should be dismissed because both the Excerpt and the E-Mail are expressions of constitutionally-protected opinion.

**A.  <u>The Book Excerpt Is An Expression of Opinion Protected By the First Amendment.</u>**

Plaintiff views the Excerpt through his hyper-sensitive academic lens to conclude that his fellow scholars would only understand that the Excerpt charges him with academic fraud. He disregards the nature of the Book and the context in which the Excerpt appears to argue that "this case is not about the clash of scholarly opinions on the subject of gun control," Opposition at 15, but "an action about Defendants' false accusations regarding Lott's research methodology," <u>id.</u> at 2. On the contrary, the Excerpt is simply about the common-place difference of opinion among

8

academic scholars.  The Excerpt has nothing to do with Lott's research methodology, and everything to do with his *ideas* when, in Plaintiff's own words, "Lott's conclusions on this subject have generated a great deal of controversy."  Id. at 3.  The Book indeed addresses that "controversy" by telling the reader that other scholars have come to different conclusions from what Lott found; they could not replicate his results.

By its very terms, the Excerpt is part of a controversial debate among economists and scholars whether liberal gun control laws cause a reduction in crime.  Read in the harshest possible light, the Excerpt criticizes Lott's "*hypothesis*" and his "*results*" that less stringent gun control laws reduce crime.  Far from putting Lott's research under a microscope, the Excerpt, when fairly read in its full context, specifically puts aside the question whether Lott's "data were faked."  Instead, it sets forth Lott's hypothesis and results and then notes disagreement among other scholars with his ultimate conclusion.  The words used in the Excerpt further signal to the reader that the Excerpt is about Plaintiff's controversial ideas and his role in the broader debate, not about definitely resolving any of those issues.  See Book at 133-34 ("his theory *might* be surprising", Plaintiff "let himself become a lightning rod for gun controversy", he "exacerbated his trouble" and his "admittedly intriguing hypothesis doesn't *seem* to be true") (emphasis added).

Under these circumstances, the Excerpt is emphatically about the validity of Lott's *ideas* – his conclusion that more guns equals less crime – *not* a factual attack on his person or his academic integrity.  Accordingly, the Excerpt contains statements made in the context of a vigorous academic discussion which courts have long held cannot be the subject of a defamation dispute -- no matter how sharp the criticism may be -- but, in keeping with the First Amendment, is simply ripe for further debate and exchange of ideas.  See also Dilworth v. Dudley, 75 F.3d

9

307, 310-11 (7th Cir. 1996) (statement by professor that the plaintiff engineer is a "crank" is protected opinion; "To call a person a crank is basically just a colorful and insulting way of expressing disagreement with his master idea, and it therefore belongs to the language of controversy rather than to the language of defamation," especially in the context of criticisms exchanged among scholars); Underwager v. Salter, 22 F.3d 730, 736 (7th Cir. 1994) (statement that plaintiff psychologist's theories are unsupported by the evidence is protected opinion; plaintiffs "cannot, simply by filing suit and crying 'character assassination!', silence those who hold divergent views, no matter how adverse those views may be to plaintiffs' interests. Scientific controversies must be settled by methods of science rather than by methods of litigation.").

Moreover, Plaintiff stresses that Illinois has allegedly adopted a multiple part "test" to determine whether a statement is an opinion and then argues that the *sine qua non* of that test is the objective verifiability of the statement.[5] See Opposition at 8-9. While Defendants do not dispute that Illinois courts take into consideration whether a statement is objectively verifiable, according to the express terms of Plaintiff's own "test", courts also consider the "general tenor of the context in which the statement appears" and "the social context and setting in which the statement was published." Id. Indeed, the Seventh Circuit has made clear that "the defamatory

---

[5] Plaintiff's so-called "test" stems from the four factors set forth in Ollman v. Evans, 750 F.2d 970 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127, 105 S. Ct. 2662, 86 L.E.2d 278 (1985). Defendants disagree that Illinois had formally adopted the Ollman factors as its definitive test to decide whether a statement is an opinion. None of the cases Plaintiff cite support this proposition. See e.g., Solaia Technology, LLC v. Specialty Publ'g Co., No. 100555, 2006 WL 1703487, at *14 (Ill. June 22, 2006) (referring to the four factors as "considerations [which] aid our analysis"). Indeed, Plaintiff's cases contradict the existence of this fixed "test". See Skolnick v. Corr. Med. Servs., Inc., 132 F. Supp. 2d 1116, 1125 (N.D. Ill. 2001) (stating that "Illinois courts have used a couple of different tests to analyze the issue" including the Ollman test and the "slightly different three part test" from Hopewell v. Vitullo, 299 Ill. App. 3d 513, 701 N.E.2d 99 (1998) and that "*[n]either of these tests is a hard and fast analysis. The emphasis is on the totality of the circumstances* and whether the statement can be reasonably interpreted as stating actual facts or objectively verified as true or false.") (emphasis added); see also Mittelman v. Witous, 135 Ill.2d 220, 243-444, 552 N.E.2d 973, 984 (1989) (adopting Ollman to "supplement, rather than replace, the analytical framework of the Restatement" to determine whether a statement is a protected opinion).

capability of…terms cannot be determined without consideration of context," and it is a "question that can be answered only by considering the context in which the term appears." Dilworth, 75 F.3d at 310, citing Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970).

Here, the broader and narrower context in which the Excerpt appears make clear that it is an expression of non-actionable opinion. Freakonomics is written for an everyday audience and is expressly dedicated to an "invented field of study" which, utilizing a "sort of treasure-hunt approach," allows the authors "to explore whatever freakish curiosities may occur to [them]", Book at p. 14. The most likely result of reading Freakonomics is that the reader will find himself or herself asking a lot more questions about conventional wisdom. See Book, Epilogue, 206. At the same time, the Excerpt appears in a chapter dedicated to exploring various theories of causation as to the highly complex issue of what reduces crime in society. The nature of this discussion lends itself to a heated argument among academics. The substance of the dispute is not a mathematical calculation for which there is a clear, unambiguous answer, but rather an exploration of amorphous and almost unanswerable social questions for which there can never be a definitive study. Even while noting that others may disagree with his "results", the Excerpt expressly notes that Lott's theory is a "sensible one," a phrase that plainly is evaluative and analytical, not factual.

Considered in context, therefore, a reader would not construe the Excerpt as asserting a provably false and defamatory statement of fact about Plaintiff, but as an expression of opinion about an inherently unanswerable question. See Lane v. Random House, Inc., 985 F. Supp. 141, 150-51 (D.D.C. 1995) (statement criticizing plaintiff's book about who killed John F. Kennedy as misleading the public); see also Moldea v. New York Times Company, 22 F.3d 310, 315 (D.C.

11

Cir. 1994) (post-Milkovich case law establishes that "when a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow wide latitude for interpretation"). The Excerpt is precisely the sort of expression about an "interpretation, a theory, conjecture or surmise" that the Seventh Circuit identified as non-actionable, protected opinion in Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993).[6] Accordingly, the Excerpt is non-actionable and Count I should be dismissed.

**B. The E-Mail is a Constitutionally Protected Expression of Opinion.**

Although Plaintiff avers that the E-Mail contains statements which can be proven true or false, the E-Mail's "loose, figurative, or hyperbolic language" is rhetorical hyperbole which cannot be the subject of a defamation claim. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990). Despite Plaintiff's academic-specific explanation of "peer-refereed", which relies heavily on facts outside of the pleadings, in the eyes of an ordinary reader, both the terms "peer" and "refereed" are "too vague and amorphous to be falsifiable."[7] Dilworth, 75 F.3d at 309. Similarly, the truth or falsity of whether Plaintiff was able to "buy the issue" and put in "only work that supported him" turns on the reader's subjective viewpoint. In addition, there can be no question that the term "outraged" to describe Levitt's friend's response to Lott's "Special Issue" is a descriptive statement which defies objective verification -- especially given that the term

---

[6] The sole case Plaintiff relies on in his Opposition Memorandum to argue that the Excerpt is not protected opinion is Republic Tobacco Co. v. North Atlantic Trading Co., 381 F.3d 717 (7th Cir. 2004), but the statements complained of in that action were entirely dissimilar from the statement Plaintiff complains of here because the truth or falsity of those statements could be readily determined. In Republic Tobacco, the court found that whether plaintiff held a valid trademark or copyright which had been violated and whether defendant had interposed certain legal claims in a related lawsuit were objectively verifiable. Republic, 381 F.3d at 729. Here, by contrast, the statements complained of are about Plaintiff's *ideas* and an inherently ambiguous and controversial debate about an issue that defies a clear-cut resolution.

[7] Certainly, Plaintiff does not dispute certain basic facts about the Special Issue (which underlie much of Levitt's opinion): 1) there was a Special Issue; (2) that Issue contained articles which were solicited and arranged by Lott; (3) the publication of this Special Issue was approved by the publishers of The Journal of Law & Economics; and (4) Lott financed the printing and mailing costs of the Special Issue. See Compl. ¶ 18, 21, 22.

applies to his friend's emotive reaction, not Levitt's. This conclusion is further supported by the E-Mail's context; here, one John McCall allegedly sent Levitt an email precisely because he wanted to ask Levitt about his reasons for disagreeing with Lott's ideas in the Special Issue. Based on this context, McCall, the sole recipient of the E-Mail, knew that Levitt was expressing his own subjective viewpoint. See Mr. Chow v. Ste. Jour Azur, S.A., 759 F.2d 219, 227 (2d Cir. 1985); see also Haynes, 8 F.3d at 1227.[8] As such, the E-Mail expresses Levitt's constitutionally protected opinion and Count II of the Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants HarperCollins and Levitt respectfully request that this Court grant their motion and dismiss the entire Complaint against them with prejudice, together with costs, and such further relief as it deems appropriate.

Dated: July 24, 2006

HARPERCOLLINS PUBLISHERS LLC AND
STEVEN D. LEVITT

By: s/ Slade R. Metcalf
One Of Their Attorneys

Slade R. Metcalf
Gail C. Gove
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

David P. Sanders (#02452359)
Wade A. Thomson (#6282174)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 606011
(312) 222-9350

---

[8] Although Plaintiff invokes Houlahan v. World Wide Ass'n of Specialty Programs and Schools, No. Civ. A 04-011612006 WL 785326 (D.D.C. Mar. 28, 2006) to argue that the E-Mail is not an expression of constitutionally protected opinion, that case actually *supports* Levitt's position. In Houlahan, the court stressed the importance of context by "looking at the e-mail in its entirety" and examining "the overall tenor of the e-mail" to determine whether the statement complained of was protected opinion. Id. at *3. Here, examination of the E-Mail's context makes clear that its recipient knew that Levitt was expressing his own subjective viewpoint.

# CERTIFICATE OF SERVICE

      I, Slade R. Metcalf, an attorney in this matter, certify that on July 24, 2006, I caused copies of the foregoing **Reply Memorandum In Support Of Defendants' Motion To Dismiss** to be served on the persons identified below via telecopier and by U.S. Mail.

| | |
|---|---|
| Stephen H. Marcus, Esq. | Thomas A. Vickers, Esq. |
| Law Office of Stephen H. Marcus | Vanek, Vickers & Masini, P.C. |
| 1050 17th Street N.W. | 225 W. Washington Street |
| Suite 600 | 18th Floor |
| Washington, DC 20036 | Chicago, Illinois 60606 |
| (202) 331-7272 | (312) 224-1510 |

                                                     s/ Slade R. Metcalf
                                                    Slade R. Metcalf