UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILINOIS
EASTERN DIVISION

JOHN R. LOTT, JR., )
)
       **Plaintiff,** )
) No. 06 C 2007
v. )
) Judge Ruben Castillo
STEVEN D. LEVITT and, )
HARPERCOLLINS PUBLISHERS, )
INC., )
)
       **Defendants.** )

### MEMORANDUM OPINION AND ORDER

In 2005, well-known economist Steven Levitt ("Levitt") and journalist Stephen J. Dubner ("Dubner") coauthored the best-selling book *Freakonomics*, which was published by Defendant HarperCollins Publishers, Inc. ("HarperCollins"). This Court, like many other individuals, has completed a cover-to-cover reading of the book. In the book, Levitt and Dubner spend one paragraph discussing the theory for which fellow economist, Plaintiff John R. Lott, Jr. ("Lott"), is known for: that laws permitting individuals to carry concealed weapons result in a statistically significant and provable reduction in serious crime rates. (R. 1, Compl. ¶ 7.) Lott filed the instant lawsuit against Levitt and HarperCollins (collectively, "Defendants"), claiming in Count I that a sentence written about him in *Freakonomics* constitutes defamation *per se*. In addition, Lott claims in Count II that an email written by Levitt to another economist also constitutes defamation *per se*. Currently before the Court are Defendants' motion to dismiss Count I (R. 15,

HarperCollins Mot. to Dismiss),[1] and Levitt's motion to dismiss Count II (R. 16, Levitt Mot. to Dismiss).[2]

## LEGAL STANDARDS

Defendants argue that Plaintiff's Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. The Court will grant a motion to dismiss under Rule 12(b)(6) only if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (internal citations omitted). When considering a motion to dismiss under Rule 12(b)(6), this Court views all facts alleged in the complaint, as well as any inferences reasonably drawn from those facts, in the light most favorable to the plaintiff. *Szumny v. Am. Gen. Fin.*, 246 F.3d 1065, 1067 (7th Cir. 2001).

## ANALYSIS

Lott is discussed in the following single paragraph in Chapter 4 of *Freakonomics*, entitled "Where Have All the Criminals Gone?":

> Then there is an opposite argument—that we need more guns on the street, but in the hands of the right people (like high-school girl above, instead of her mugger). The economist John R. Lott Jr. is the main champion of this idea. His calling card is the book *More Guns, Less Crime*, in which he argues that violent crime has decreased in areas where law-abiding citizens are allowed to carry concealed

---

[1] Defendants attached a copy of the book, *Freakonomics*, to their motion to dismiss. (R. 20, Ex. 1 to HarperCollins' Mot. to Dismiss.) Although Lott did not attach the book to his Complaint, a court may look to documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the claim. *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 731 (7th Cir. 2005). As Lott heavily relied on *Freakonomics* in his Complaint, *Freakonomics* is considered a part of the pleadings, and this Court will consider the book with these motions to dismiss.

[2] Levitt specifically adopted the memorandum submitted by HarperCollins in support of their motion to dismiss Count One of the Complaint. (R. 22, Levitt's Mem. in Supp. of Mot. to Dismiss at 1.)

2

weapons. His theory might be surprising, but it is sensible. If a criminal thinks
his potential victim may be armed, he may be deterred from committing the crime.
Handgun opponents call Lott a pro-gun ideologue, and Lott let himself become a
lightning rod for gun controversy. He exacerbated his trouble by creating a
pseudonym, "Mary Rosh," to defend his theory in online debates. Rosh,
identifying herself as a former student of Lott's, praised her teacher's intellect, his
evenhandedness, his charisma. "I have to say that he was the best professor that I
ever had," s/he wrote. "You wouldn't know that he was a 'right-wing' ideologue
from the class. . . . There were a group of us students who would try to take any
class that he taught. Lott finally had to tell us that it was best for us to try and take
classes from other professors more to be exposed to other ways of teaching
graduate material." Then there was the troubling allegation that Lott actually
invented some of the survey data that support his more-guns/less-crime theory.
Regardless of whether the data were faked, Lott's admittedly intriguing hypothesis
doesn't seem to be true. When other scholars have tried to replicate his results,
they found that right-to-carry laws simply don't bring down crime.

(R. 20, Ex. 1 to HarperCollins' Mot. to Dismiss at 133-34.) On May 24 or May 25, 2005, John

McCall ("McCall"), described by Lott as an economist residing in Texas, sent Levitt an email

regarding the above passage, stating:

I also found the following citations—have not read any of them yet, but it appears
they all replicate Lott's research. The Journal of Law and Economics is not
chopped liver.
Have you read through any of these?
http://johnrlott.tripod.com/postsbyday/RTCResearch.html

(R. 1, Compl. ¶ 19.) That same day, Levitt responded:

It was not a peer refereed edition of the Journal. For $15,000 he was able to buy
an issue and put in only work that supported him. My best friend was the editor
and was outraged the press let Lott do this.

(*Id.* at 20.) Lott alleges that Levitt's email and the last sentence of the relevant paragraph in

*Freakonomics* are defamatory *per se*. (*Id.* ¶¶ 14, 21.)

I. **Illinois Defamation *Per Se***

A statement is considered defamatory if it tends to cause such harm to the reputation of

3

another that it lowers that person in the eyes of the community or deters third persons from associating with that person. *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 981 (7th Cir. 2004) (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996)). In alleging that the sentence from *Freakonomics* and Levitt's email to McCall are defamatory *per se*, Lott is claiming that the statements are so harmful to his reputation that damages are presumed. *Knafel v. Chi. Sun-Times, Inc.*, 413 F.3d 637, 639 (7th Cir. 2005) (citing *Van Horne v. Muller*, 705 N.E.2d 898, 903 (Ill. 1998).)

As this is a state law defamation suit, this Court applies the substantive law of the state in which this case was filed: Illinois. *Global Relief Found.,*, 390 F.3d at 981. The parties do not dispute that Illinois substantive law applies here. (*See* R. 15, Mot. to Dismiss at 2; R. 25, Opp'n to Mot. to Dismiss at 8 n.5.) As this is a diversity case, federal procedural law applies. *Knafel*, 413 F.3d at 639 (citing *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918 (7th Cir. 2003)).

For a statement to be defamatory *per se* in Illinois, it must fall under one of five categories:

> (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). Lott contends that the statements about him in *Freakonomics* and the email fall under the fourth category of language that qualifies as defamation *per se* because they imply that his results were falsified or that his theories lack merit, and thus impute a lack of ability and integrity in his profession as an

economist, academic, and researcher. (R. 1, Compl. ¶¶ 14, 22.) Indeed, a claim that an academic or economist falsified his results and could only publish his theories by buying an issue of a journal and avoiding peer review would surely impute a lack of ability and prejudice that person in his profession. *See, e.g., Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 207 (Ill. 1992) (statements that implicitly accused the plaintiff of lying and of attempting to deceive the public certainly could be found to have damaged the plaintiff's integrity and prejudiced him in his business).

Defendants attempt to argue that the determination of whether the statements fall into a *per se* category requires reliance on "extrinsic facts," which is improper since *per se* actions must "stand or fall upon the import of the statement, without the aid of extrinsic facts." (R. 23, Mem. in Supp. of HarperCollins Mot. at 13, quoting *Mittelman v. Witous*, 552 N.E.2d 973, 979 (Ill. 1989).) This Court, however, has relied only on the pleadings and the documents properly attached thereto in determining whether the statement fall into a *per se* category. Accordingly, the Court finds that Lott's pleadings sufficiently allege that the statements in *Freakonomics* and the email are capable of a defamatory *per se* meaning in that they may be interpreted in a manner that imputes a lack of ability in Lott's profession as an economist, academic, and researcher.

## II. *Freakonomics*

Even if a statement falls into a recognized category of defamation *per se*, it will not be found to be defamatory if it is "reasonably capable of an innocent construction." *Knafel*, 413 F.3d at 639-40 (quoting *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992)). Both the courts of Illinois and the Seventh Circuit hold that "[w]hether a statement is reasonably capable of an innocent construction is a question of law for the court to decide." *Id.* (quoting

5

*Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717, 727 (7th Cir. 2004)); *see also Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996); *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (Ill. 1982). In determining whether a statement is reasonably capable of an innocent construction, courts must consider statements in context, "giving the words, and their implications, their natural and obvious meaning." *Knafel*, 413 F.3d at 640 (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996)). That is, a court must interpret the words of the statement "as they appear[ ] to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 672 N.E.2d at 1217; *Republic Tobacco*, 381 F.3d at 730. Further, a reviewing court must consider all parts of the publication in order to ascertain the true meaning of the words. *Barry Harlem Corp. v. Kraff*, 652 N.E.2d 1077, 1080 (Ill. App. Ct. 1995); *May v. Myers*, 626 N.E.2d 725, 727 (Ill. App. Ct. 1993); *City of Chi. v. Holland*, 206 Ill.2d 480, 492, 795 N.E.2d 240 (2003).

"[A] statement 'reasonably' capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. There is no balancing of reasonable constructions." *Mittelman v. Witous*, 552 N.E.2d 973 (Ill. 1989). In other words, if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924-25 (7th Cir. 2003) (citing *Anderson*, 667 N.E.2d at 1302). If the complained-of statement "may reasonably be innocently interpreted, it cannot be actionable *per se*." *Bryson*, 174 Ill.2d at 93, 672 N.E.2d 1207 (citing *Harrison v. Chi. Sun-Times, Inc.*, 793 N.E.2d 760, 772 (Ill. App. Ct. 2003)).

As noted above, Lott claims that the following sentence in *Freakonomics* is defamatory *per se*: "When other scholars have tried to replicate [Lott's] results, they found that

right-to-carry laws simply don't bring down crime." (R. 20, HarperCollins Mot. to Dismiss, Ex. 1, *Freakonomics* at 134.) Lott argues that the only reasonable meaning of the last sentence is that he falsified his results because "the term 'replicate' has an objective and factual meaning in the world of academic research and scholarship." (R. 1, Compl. ¶ 12.) Specifically, Lott claims that the "clear and unambiguous meaning" of "replicate" is that "other scholars have analyzed the identical data that Lott analyzed and analyzed it the way Lott did in order to determine whether they can reach the same result." (*Id.*) By claiming that other scholars have tried to "replicate" his research and results, but come to a different conclusion than Lott, Lott claims that the sentence in *Freakonomics* alleges that "Lott falsified his results." (*Id.*)

The applicable standard, however, is not that of the "world of academic research and scholarship" that Lott describes. Rather, the critical question is how a "reasonable reader" would interpret the phrase. *Bryson*, 672 N.E.2d at 1217. The reasonable reader in this case is the general population, who helped make *Freakonomics* an "extraordinarily successful," "best-selling book." (R. 1, Compl. ¶ 8.) In everyday language, replicating "results" does not necessarily mean analyzing identical data in identical ways, and thus it is reasonable to read the sentence at issue as not accusing Lott of falsifying his results. In fact, it is more reasonable to read the sentence as stating that other scholars testing the same hypothesis have done separate research, with possibly different data and statistical analyses, and come to different conclusions, thus disproving Lott's theory; or simply, that other scholars attempted to arrive at the same conclusions as Lott had, but were unable to do so. (R. 26, Defs.' Reply at 2.)

The context of the statement at issue supports these innocent interpretations. *Knafel*, 413 F.3d at 640. The paragraph about Lott makes no mention of Lott's protocols or methodology or

analyses. Likewise, a reading of the entire chapter of *Freakonomics* supports an innocent interpretation of the disputed sentence. The chapter, entitled "Where Have All the Criminals Gone?", reviews multiple theories as to why crime decreased in the 1990's and discredits every theory except Levitt's own theory, that the legalization of abortion in *Roe v. Wade* in 1973 prevented the birth of the would-be criminals of the 1990's. *See generally*, *Freakonomics*, Ch. 4, "Where Have All the Criminals Gone?", pp. 115-144. In this context, the allegedly defamatory sentence could be innocently read as disagreeing with the results of Lott's research—that more guns decreases crime—in the same way that Levitt disagreed with the results of multiple other theorists on the topic of why crime decreased in the 1990's. Levitt disagrees with a host of theories and theorists including: the theories of criminologists James Alan Fox, James Q. Wilson, and George Kelling; the theories that crime dropped because of tougher gun-control laws (the opposite view of Lott's); the bursting of the crack bubble; innovative policing strategies; the increased number of police; increased punishment; the aging of the population; and improvement in the economy. *Id*. In fact, while Levitt sets forth his own theory of what actually caused the crime rate to decrease in the 1990's, he does not claim to definitively know the answer. Rather, the chapter demonstrates that scholars and academics have widely debated the controversial issue of whether gun control laws reduce crime. Furthermore, the chapter contains very little discussion of other economists' or criminologists' specific research protocols, methodology, or statistics, such that it would cause a reasonable reader to read the sentence at issue here as implying or meaning that Lott falsified his data. In fact, the entire book contains little description of other theorists' specific research protocols and methodology, and an endnote to the paragraph about Lott clarifies the intended definition of the term "replicate" to be simply that other scholars

have disproved Lott's gun theory, not that they proved Lott falsified his data.[3]

The litany of partial dictionary definitions of "replicate" cherry-picked by Lott do not change this analysis. The definitions all state in one way or another that "replicate" means to repeat, duplicate, copy, or reproduce; however, the definitions do not support Lott's claim that the term "replicate" should refer to his data and statistical analyses instead of his results or conclusions. (R. 25, Lott's Opp'n Br. at 11-12.) The only one of nine proposed definitions which indicate that the term "replicate" refers to Lott's data and statistical analyses rather than just his results specifically applies to the field of statistics, not to the everyday language of the reasonable reader of *Freakonomics*. (*Id.* at 11.) In that example, Lott cites to Webster's New World College Dictionary (4th ed. 2004), which states: "*Statistics* the exact duplication of an experiment for verification, criticism or extension of previous results." (*Id.*)

This Court's finding that the alleged defamatory sentence is reasonably subject to innocent interpretations accords with the case law in Illinois and the Seventh Circuit. In *Knafel*, for example, the defendant journalist wrote: ". . . based on the money [the plaintiff's] been paid already and the additional funds she's seeking in exchange for her affair with Jordan, she's making herself sound like someone who once worked in a profession that's a lot older than singing or hair designing." *Knafel*, 413 F.3d at 641. The plaintiff sued for defamation, alleging that the author accused her of committing the crime of prostitution. While acknowledging that the author "almost certainly refers to prostitution," the Seventh Circuit held that it was reasonable

---

[3] (*See* R. 20, Ex. 1 to HarperCollins' Mot. to Dismiss at 221 ("133-34: Lott's gun theory disproved: See Ian Ayres and John J. Donohue III, 'Shooting Down the More Guns Less Crime Hypothesis,' *Stanford Law Review* 55 (2003), pp. 1193-1312; and Mark Duggan, 'More Guns, More Crime,' *Journal of Political Economy* 109, no. 5 (2001), pp. 1086-1114."))

to read the accused author's words and not think of the alleged defamatory meaning. *Id.* The Seventh Circuit found that the most likely interpretation of the words was that the woman was a gold digger, or demeaning herself for a longer term relationship with a man because of his money, not one who would look at a wealthy man and see a chance to make a few quick bucks for a one-time encounter. *Id.* In addition, the Court explained that the author does not state that the plaintiff committed the crime of prostitution "but, rather, she is making herself sound like she has." The Court thus ruled that the words were reasonably subject to an innocent construction; *i.e.*, one that stops short of saying she committed a crime. *Id.* at 642.

Likewise, the Illinois Appellate Court has found arguably more clearly defamatory statements to be subject to reasonable innocent constructions. In *Haberstroh v. Crain Publications, Inc.*, for example, three published letters had the following to say about the plaintiff professor: "To Mr. Haberstroh's students, I would say: Run for your creative lives! This guy isn't travelling with a full set of luggage;" and "Why would anyone study a subject from a guy who obviously doesn't understand it?" 545 N.E.2d 295, 298 (Ill. App. Ct. 1989). Despite this harsh language directly addressing the plaintiff's job as professor, the Illinois Appellate Court held that the letters could reasonably be innocently construed as an assessment of the merits of the plaintiff's views, and not a personal account of plaintiff's activities nor an assault on plaintiff in his profession as a teacher. *Id.* at 299. Similarly, in *Salamone v. Hollinger International, Inc.*, the Illinois Appellate Court held that a newspaper article entitled "Mob links hurt Rosemont casino bid," which stated that the plaintiff was a "reputed organized crime figure," could be innocently construed to mean that the plaintiff was not a mobster, "but [] a person who is believed to be, possibly erroneously, an organized crime figure." 347 Ill. App. 3d 837, 840-41,

10

807 N.E.2d 1086 (Ill. App. Ct. 2004); *see also Harte v. Chi. Council of Lawyers*, 220 Ill. App. 3d 255, 261-62, 581 N.E.2d 275 (1991) (holding that it was reasonable to construe a statement that plaintiff was implicated in a corruption scandal to mean he was intimately involved, not that he was incriminated); *Antonelli v. Field Enters., Inc.*, 450 N.E.2d 876 (Ill. App. Ct. 1983) (holding that news article titled " Mobster v. Media" and referring to plaintiff as "reputed mobster" subject to an innocent construction).

The Illinois Supreme Court's recent opinion in *Tuite v. Corbitt* does not change this result. No. 101054, 2006 WL 3742112 (Ill. Dec. 21, 2006). In *Tuite*, the Court reaffirmed Illinois' innocent construction rule, yet nevertheless reversed the judgments of the appellate and trial court, which had dismissed Tuite's complaint for defamation *per se*. In so holding, the Illinois Supreme Court reiterated that: "When a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibelous under the innocent construction rule." *Id.* at *7 (quoting *Bryson*, 174 Ill. 2d at 93, 672 N.E.2d 1207). That, however, is just what the lower courts in *Tuite* did in finding an innocent interpretation of the defendant author's statements that after the plaintiff attorney received a $1 million retainer in allegedly illegally obtained funds, he "had it all handled" and that his client viewed his acquittal as a "done deal". *Id.* at *2. The Court found that "[i]n the context of this book about crime and widespread corruption, these statements naturally indicate that Tuite was expected to engage in bribery or payoffs to secure the acquittals." *Id.* at *12. Accordingly, the Court concluded that a defamatory construction of the disputed statements is "far more reasonable" than any innocent construction, which would be "strained and unreasonable." *Id.* at *13; *see also Republic Tobacco*, 381 F.3d at

730 (holding that "[i]t stretches reason to interpret 'legal action' as 'any activity of a lawyer' when it is used in daily parlance to mean a lawsuit or legal proceeding.")

In the instant case, by contrast, the far more reasonable construction of the disputed sentence in *Freakonomics* is an innocent one, that other scholars—using separate data, statistical analyses, and research—have attempted to arrive at the same results as Lott, but have come to different conclusions and disproved Lott's theory. Therefore, considering the entirety of *Freakonomics* and the arguments made by both parties, the Court finds that the alleged sentence is reasonably capable of several innocent, nondefamatory constructions, which are more reasonable than Lott's proposed defamatory construction. Accordingly, Defendants' motion to dismiss Count I of Lott's Complaint is granted, and Count I is dismissed with prejudice.

### III. The Email Exchange

While the Court concludes that Lott does not have an actionable defamation case against Defendants for the excerpt from *Freakonomics*, the same cannot be said about Levitt's unfortunate and ill-considered email response to McCall. In the second, and final count of the Complaint, Lott claims that the email exchange between Levitt and economist John McCall is defamatory *per se*. In the email exchange, McCall referred Levitt to a special issue of The Journal of Law & Economics ("Journal") published in October 2001 ("Special Issue"), which contained a collection of articles addressing right-to-carry laws. These articles were delivered at an academic conference co-sponsored by the Center for Law, Economics, and Public Policy at Yale Law School and the American Enterprise Institute, where Lott was recently a resident scholar. (R. 1, Compl. ¶¶ 1, 18.) In response to McCall's emailed comment that the Journal was not "chopped liver," and his question as to whether Levitt had read the Special Issue, Levitt

12

emailed the following reply that same day: "It was not a peer refereed edition of the Journal. For $15,000 he was able to buy an issue and put in only work that supported him. My best friend was the editor and was outraged the press let Lott do this." (*Id.* ¶ 20.)

Lott claims that Levitt's statements that the Journal was not "peer reviewed" and that "For $15,000 [Lott] was able to buy an issue and put in only work that supported him" are false and defamatory *per se* because they attack Lott's honesty and integrity as an economist, scholar, and researcher. (*Id.* ¶¶ 21-22.) Lott argues the Journal was peer reviewed and that he did not "buy" the issue, nor did he "put in only work that supported him." (*Id.* ¶ 22.) Lott admits, however, that he "raised the funds to pay the journal's printing and mailing costs." (*Id.* at ¶ 18.)

## A.  Innocent Construction Rule

Defendants urge this Court to adopt one of the following innocent interpretations of the email: (1) that the email is merely stating Levitt's best friend's view as to the merits the Special Issue (R. 22, Levitt's Mem. in Supp. of Mot. to Dismiss at 6; R. 26, Reply at 3); or (2) that it is not clear whether it is "disreputable" or unprofessional to pay or "provid[e] funding" for an edition of a journal (or portions thereof, as Plaintiff concedes he did, Compl. ¶ 18), or to include in the journal only works that are consistent with one's theory (R. 22, Levitt's Mem. in Supp. of Mot. to Dismiss at 5; R. 26, Reply at 3). We address each of these proposed constructions in turn.

First, the email is not reasonably capable of being construed as merely reiterating Levitt's friend's thoughts. Levitt's "best friend" was not mentioned until the last sentence of the email, and the first two sentences are not set out as the thoughts of Levitt's friend, but rather as Levitt's own statements. Second, an interpretation of the accusation that Lott "bought" the Journal and

13

put in only work that supported him is not reasonably capable of a construction other than one attacking Lott's skill and integrity in his profession, especially in light of Levitt's suggestion that the Journal's editor was "outraged" by this practice. As explained above, "[w]hen a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibelous under the innocent construction rule." *Tuite*, 2006 WL 3742112, at *7. Accordingly, this Court finds that Lott has demonstrated that the email statements qualify as defamatory *per se* because they impute a lack of ability in Lott's profession, and cannot reasonably be innocently construed.

### B.     First Amendment

Levitt's email is also not entitled to constitutional protection. While there is no additional separate constitutional privilege for "opinion," the First Amendment protects statements that cannot be "reasonably interpreted as stating actual facts." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Whether or not a statement is a factual assertion that could give rise to a defamation claim is a question of law for the court. *Hopewell v. Vitullo*, 701 N.E.2d 99, 102 (Ill. App. Ct. 1998); *Lifton v. Board of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005).

The test for whether a statement is a factual assertion is whether the statement is precise, readily understood, and susceptible of being verified as true or false. *Lifton*, 416 F.3d at 579. This test, like the test for innocent construction, is a reasonableness standard; whether a reasonable reader would understand the defendant to be informing him of a fact or opinion. *Republic Tobacco*, 381 F.3d at 729; *Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 448-49 (Ill. App. Ct. 1999) (citing *Bryson*, 672 N.E.2d at 1217). Language that is

"loose, figurative, or hyperbolic" negates the impression that a statement is asserting actual facts. *Milkovich*, 497 U.S. at 21. Accordingly, "[v]ague, unprovable statements and statements of opinion do not give rise to a defamation claim." *Lifton v. Board of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005). "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Republic Tobacco*, 381 F.3d at 727 (internal citations omitted).

In this case, however, Levitt's email sounds as if he was "in possession of objectively verifiable facts." *Id.* In his email, Levitt stated: "It was not a peer refereed edition of the Journal. For $15,000 he was able to buy an issue and put in only work that supported him. My best friend was the editor and was outraged the press let Lott do this." (R. 1, Compl. ¶ 20.) First, it would be unreasonable to interpret Levitt's unqualified statement that the journal edition was not "peer refereed" as Levitt merely giving his opinion on the "peers" chosen to review, or referee, the Special Issue. Indeed, the editor of the Journal might be able to verify the truth of falsity of whether the Special Issue was reviewed by peers. Furthermore, while Levitt argues that one person's "'peer' in the academic realm may be another person's 'hack'," this distinction is not reasonable when discussing the review process at a top university's academic journal. (R. 22, Defs.' Reply at 3.) Second, a reasonable reader would not interpret Levitt's assertion that "For $15,000 [Lott] was able to buy an issue and put in only work that supported him" as simply a statement of Levitt's opinion. Levitt's email appears to state objectively verifiable facts: that Lott paid $15,000 to control the content of the Special Issue. The editor of the Journal again might be the source to verify the truth or falsity of this statement. Third, the same editor could

15

verify whether he was "outraged" by the acts described in the foregoing statements. Therefore, the defamatory statements in Levitt's email to McCall are objectively verifiable, and Levitt's motion to dismiss Count II of Lott's Complaint is denied.

## CONCLUSION

The Seventh Circuit has stated that "judges are not well equipped to resolve academic controversies, . . . , and scholars have their own remedies for unfair criticisms of their work—the publication of a rebuttal." *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996). The statements about Lott in *Freakonomics* reflected just such an academic controversy, and nothing more. In his email to McCall, however, Levitt made a string of defamatory assertions about Lott's involvement in the publication of the Special Issue of the Journal that—no matter how rash or short-sighted Levitt was when he made them—cannot be reasonably interpreted as innocent or mere opinion.

After studying the parties' briefs and the book, *Freakonomics*, and viewing all facts alleged in the complaint and all inferences reasonably drawn from those facts in the light most favorable to Lott, the Court finds that Lott does not state a claim upon which relief can be granted in Count I of his Complaint. Accordingly, HarperCollins' and Levitt's motion to dismiss Count I of Lott's Complaint is granted. (R. 15.) Since HarperCollins is only mentioned in Count I, it is hereby dismissed with prejudice. Levitt's motion to dismiss Count II of the Complaint is denied. (R. 16.)

This lawsuit is hereby set for a status hearing on January 24, 2007 at 9:45 a.m. The parties are requested to fully exhaust all settlement discussions in light of this opinion.

Entered: _____
Judge Ruben Castillo
United States District Court

**Dated: January 11, 2007**