# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-3095

JOHN R. LOTT, JR.,

    *Plaintiff-Appellant,*

v.

STEVEN D. LEVITT,

    *Defendant-Appellee.*

FILED Mar 19, 2009
MAR 19 2009 PH
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2007—Ruben Castillo, *Judge.*

06cv2007

ARGUED OCTOBER 21, 2008—DECIDED FEBRUARY 11, 2009

---

Before RIPPLE, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* John Lott, an academic and economist, believes that his reputation was sullied by *Freakonomics*,[1] the popular and off-beat book written by Steven Levitt and Stephen Dubner. Lott's name was mentioned in one paragraph of the 200-page book, and he

---

[1] Steven D. Levitt & Stephen J. Dubner, *Freakonomics: A Rogue Economist Explores the Hidden Side of Everything* (2005).

understood this passage to be an accusation of scholarly dishonesty. Offended, he filed suit against Levitt and HarperCollins, the publisher of the book, claiming that he had been defamed. The district court dismissed this claim after concluding that the passage could reasonably be read as a refutation of Lott's controversial theories and not a swipe at his integrity. Lott now appeals.

In *Freakonomics*, Levitt, a self-described rogue economist, seeks to explore "the hidden side of everything." Using an economist's analytical tools, Levitt (and his co-author, Dubner, who is not named in this suit) embarks on a "treasure-hunt" of "freakish curiosities," investigating, for example, the similarities between nylon stockings and crack cocaine, or the socioeconomic forces at work when parents name their children. The book, which became a *New York Times* Bestseller, tackled one particular oddity that had left many commentators baffled—the drop in crime rates in the 1990s. Levitt devoted a chapter to this topic, debunking several different explanations for this phenomenon (including "gun buyback" programs) before attributing the decline, at least in part, to the legalization of abortion, which meant fewer children being born to mothers who didn't want them.

In this chapter, over the span of just one paragraph (pages 133-34), Levitt addressed Lott's work. Lott, author of the book *More Guns, Less Crime: Understanding Crime and Gun Control Laws*, contends that allowing law-abiding citizens to carry concealed weapons contributes to a drop in crime rates. As a champion of this politically

charged idea, Levitt writes that Lott became a "lightning rod for gun controversy," a status he exacerbated by creating a pseudonym, "Mary Rosh," which he used to defend his theory in debates over the Internet (an embarrassing charge, but one that was apparently true as Lott takes no issue with it in this case). Levitt ends his discussion of Lott's work by writing:

> Then there was the troubling allegation that Lott actually invented some of the survey data that support his more-guns/less-crime theory. Regardless of whether the data were faked, Lott's admittedly intriguing hypothesis doesn't seem to be true. When other scholars have tried to replicate his results, they found that right-to-carry laws simply don't bring down crime.

To Lott, these sentences amounted to an accusation that he falsified his results.

Lott responded by filing a defamation suit against Levitt and HarperCollins before the district court, invoking diversity jurisdiction. In his complaint, Lott alleges that "replicate," within the "world of academic research and scholarship," has "a "clear and unambiguous meaning." He reads the term to mean that other scholars performed the same analysis as Lott, using identical data and methodologies. According to Lott, if the others were unable to reach the same results as him, an assertion he claims is untrue, then the inescapable conclusion is that he fabricated his findings or was too incompetent to reach the right ones. Lott added a second defamation claim regarding an e-mail exchange Levitt had with another economist,

in which Levitt accused Lott of buying support for his theory by paying for the publication of a journal filled only with non-peer refereed articles that bolstered his hypothesis.

Both Levitt and HarperCollins filed motions to dismiss the suit, arguing that the statements in *Freakonomics* were not defamatory and were otherwise protected by the First Amendment. The defendants attached a copy of the book to their motions, which the district court (Judge Ruben Castillo) considered part of the pleadings because the book was central to Lott's claim. *See Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 731 n.3 (7th Cir. 2005). The court, applying Illinois law upon the parties' agreement, dismissed the claim after concluding that the statements could reasonably be read as a description of an academic dispute regarding controversial theories, not an accusation of academic dishonesty. Levitt also sought dismissal of the count regarding the e-mail exchange, but the court concluded that those allegations stated a claim for defamation. HarperCollins, who was not involved in the remaining claim, was dismissed from the case.

Seven months after this decision, and shortly before discovery was set to end, a flurry of activity ensued. A settlement of the remaining claim was reached, and, at the same time, Lott (who hired new counsel) filed a motion to reconsider the district court's decision to dismiss the defamation claim based on *Freakonomics*. In that motion, Lott argued that Virginia law, and not Illinois law, should have applied, despite his prior coun-

sel's acceptance and reliance on Illinois cases. The district court denied this motion, reasoning that Lott waived the choice-of-law argument. At this time, Lott also asked the court for leave to file an amended complaint, which reiterated his defamation claim based on *Freakonomics*, a request that was denied as untimely and futile. Today we resolve Lott's appeal from these decisions.

First things first—we must decide what law to apply. Lott contends that the district court erred by applying Illinois law and argues instead that Virginia law should apply. The defendants first addressed this issue in their motions to dismiss, in which they argued that Illinois substantive law should apply, raising and rejecting the possible application of Virginia law. In Lott's response, he stated that he "agree[d] with Defendants that Illinois law governs this dispute," made no separate choice-of-law analysis, and cited no Virginia cases. Accordingly, the district court decided the motions based on Illinois law. Seven months later, Lott argued for the first time that Virginia law should have governed and asked the court to reconsider its ruling, contending, as he does here, that he only agreed that Illinois choice-of-law principles should apply, not that Illinois substantive law should govern. Under Illinois's choice-of-law rubric, Lott contends the law of his domicile, Virginia, should control this case.

This argument is disingenuous. To read Lott's agreement to the governance of Illinois law so narrowly robs it of both its obvious meaning and its context. Lott explicitly submitted to Illinois law and relied solely on it, and having

done so, the district court was right to apply it to the dispute. *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996); *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995). The principle of waiver is designed to prohibit this very type of gamesmanship—Lott is not entitled to get a free peek at how his dispute will shake out under Illinois law and, when things don't go his way, ask for a mulligan under the laws of a different jurisdiction. In law (actually in love and most everything else in life), timing is often everything. The time for Lott to ask for the application of Virginia law had passed—the train had left the station.

On, then, to Illinois law. Defamation is the publication of a false statement that "tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006). To bring a successful claim, a plaintiff must normally show that the unprivileged communication of a false statement caused him harm. In Illinois this type of action is called *per quod* defamation. Some statements, however, are so obviously harmful that injury to the plaintiff's reputation can be presumed and are considered actionable *per se*. In Illinois there are five categories of *per se* defamation, two of which are pertinent in this case: (1) statements imputing an inability to perform or lack of integrity in one's duties of employment; and (2) statements that prejudice a party, or impute a lack of ability, in his profession. *Id.*

But not all statements that fall into one of these five categories are necessarily actionable *per se*—the state-

ment's only reasonable readings must also be defamatory in nature. In other words, a statement that is reasonably capable of an innocent construction is not *per se* defamatory. *Tuite*, 866 N.E.2d at 121; *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996). The Illinois courts have emphasized that the meaning of a statement is not a fact for the jury to find, but a "question of law to be resolved by the court." *Tuite*, 866 N.E.2d at 122. To discern the meaning, courts must draw from the context of the statement and give the words their "natural and obvious meaning." *Id.* (citing *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (Ill. 1982)). Courts need not weigh the relative value of competing constructions; instead, any reasonable, nondefamatory interpretation is the one that sticks. *Id.* at 122-23; *Mittleman v. Witous*, 552 N.E.2d 973, 979 (Ill. 1989).

Lott's first argument turns this substantiative law on its procedural head. Lott argues that the district court erred when it dismissed his defamation claim on the basis of this innocent construction rule. He notes that the district court was bound by federal, not Illinois, pleading standards, and argues that federal standards preclude a preference for an innocent interpretation over a defamatory one at the pleading stage. Instead, Lott argues that his claim should have survived the motions to dismiss because the passage in *Freakonomics* is reasonably susceptible to a defamatory interpretation, notwithstanding any equally reasonable innocent interpretations that may exist.

It is true that federal courts sitting in diversity are bound by federal procedural rules, but those rules

impose no impediment for a judge to decide the natural and obvious meaning of an allegedly defamatory passage at the pleading stage. Courts, when reviewing a motion to dismiss, are indeed required to accept as true the facts alleged in the complaint, including the words used in the allegedly defamatory statement, and make all reasonable inferences in favor of the plaintiff. But that does not mean that the court must take the plaintiff's *interpretation* of the allegedly defamatory words at face value. Figuring out the meaning of a statement and whether it is reasonably susceptible to an innocent construction is a question of law for the courts to resolve. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008); *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 641 (7th Cir. 2005); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 727 (7th Cir. 2004). Our reliance on federal procedural rules does not allow us to ignore Illinois substantiative law, and shortly before the district court rendered its decision, the Illinois Supreme Court rejected the same argument Lott raises here. *Tuite*, 866 N.E.2d at 124-26. Instead, the high court reaffirmed that any reasonable, innocent interpretation sounds the death knell to a *per se* defamation claim. In doing so, the high court acknowledged that this rule puts a thumb on the scale for defendants but deemed this warranted in *per se* actions, where damages are presumed. *Id.* at 125. It is not our place to water down the Illinois high court's policy decision.

Now, on to the alleged defamation. Lott contends that Levitt's refutation of his more-guns/less-crime hypothesis can be read only as a smear of his professional reputation

and is therefore defamatory *per se*. Using an academic definition of "replicate," Lott maintains that the passage means that others repeated, to a tee, his technical analysis but were unable to duplicate his results, suggesting that he either faked his data or performed his analysis incompetently.

But this technical reading is not the only reasonable interpretation of the passage. After all, *Freakonomics* didn't become a bestseller by targeting just academics. The book takes into account the lay reader, breaking down technical terms into easily understandable, if imprecise, ideas. For example, the technicalities of regression analysis are explained by an analogy to a golfer's handicap, since both even the playing field so that variables (or golfers) can be compared on all fours. The book relies on anecdotal evidence and describes with only the broadest strokes the statistical methodologies used. In this context, it is reasonable to read "replicate" in more generic terms. That is, the sentence could mean that scholars tried to reach the same conclusion as Lott, using different models, data, and assumptions, but could not do so. This reading does not imply that Lott falsified his results or was incompetent; instead, it suggests only that scholars have disagreed with Lott's findings about the controversial relationship between guns and crime. By concluding that this more generic definition of "replicate" is reasonable, we are not assuming that the reader is a simpleton. After all, econometrics is far from conventional wisdom. We are, however, taking into account the context of the statement and acknowledging that the natural and obvious meaning of "replicate" can lie outside the realm of academia for this broadly appealing book.

A closer look at the paragraph where the contested sentence is found supports this innocent reading. The paragraph describes and critiques Lott's "idea," "theory," and "hypothesis," but makes no mention of his methodology or what data set he used. In this context, it is natural to read Levitt's statement as a critique on his theory, rather than an accusation of falsifying data. In fact, instead of weighing in on the rumor that Lott faked some of his results, Levitt distanced himself from it. Levitt mentioned the "troubling allegation," but noted that "[r]egardless of whether the data were faked, Lott's admittedly intriguing hypothesis doesn't seem to be true." Far from assailing Lott's competence, he acknowledged that Lott's theory is "sensible" and "intriguing." To the extent that Lott is complaining about an attack on his ideas, and not his character, he is barking up the wrong tree. The remedy for this kind of academic dispute is the publication of a rebuttal, not an award of damages. *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

Finally, Lott also contends, couched in two distinct procedural arguments, that he had a viable claim for *pro quod* defamation—that is a defamation claim where damages cannot be presumed. He first argues that the district court missed the *pro quod* claim in his original complaint and therefore erred by failing to address it. Alternatively, Lott argues that the district court should have allowed him to file an amended complaint that explicitly added a *pro quod* claim, instead of refusing to do so on the grounds that the proposed complaint was untimely and futile.

Both these arguments fail for the same reason—Lott neglected to allege any special damages in both his original complaint and his proposed amended complaint. In Illinois courts and federal courts sitting in diversity, special damages must be specifically stated in a *pro quod* claim. FED. R. CIV. P. 9(g); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003); *Action Repair, Inc. v. American Broadcasting Cos.*, 776 F.2d 143, 149-50 (7th Cir. 1985); *Schaffer v. Zekman*, 554 N.E.2d 988, 992 (Ill. App. Ct. 1990). In his original complaint, which made no explicit *pro quod* claim, Lott alleged only "substantial reputational and monetary damages," without a specific accounting of those damages or an explanation of how the purported defamation caused them. While the proposed amended complaint explicitly tacked on a claim for *pro quod* defamation, its allegations of damages are equally vague. Lott added allegations that he encountered people in job interviews and at academic seminars who understood the passage to be a swipe at his professional reputation but does not describe what pecuniary losses he suffered as a result. Lott doesn't even say what came of the job interviews where the book was mentioned. Such general allegations, which make no effort to explain how any reputational damage translated into actual harm, are not enough. *Muzikowski*, 322 F.3d at 927; *Action Repair, Inc.*, 776 F.2d 149-50, *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 269-70 (7th Cir. 1983). Thus, we see no error in the district court's dismissal of the defamation claim or its refusal to accept the futile amended complaint. *Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008).

Accordingly, the judgment of the district court is AFFIRMED.